**Samuel MESNICK, Plaintiff, Appellant,**

v.

**GENERAL ELECTRIC COMPANY, Defendant, Appellee.**

No. 91–1451.

United States Court of Appeals, First Circuit.

Heard Nov. 6, 1991.

Decided Dec. 16, 1991.

Scott A. Lathrop with whom Scott A. Lathrop, P.C., Boston, Mass., was on brief, for plaintiff, appellant.

David H. Erichsen with whom Susan M. Curtin and Hale and Dorr, Boston, Mass., were on brief, for defendant, appellee.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

SELYA, Circuit Judge.

This appeal calls upon us, in the course of determining whether an employer transgressed the law in its dealings with a former employee, to map the much traveled but little understood intersection between Rule 56 of the Civil Rules and the burden-shifting framework for discrimination cases first crafted by the Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). For the reasons that follow, we affirm the entry of summary judgment in the employer's favor.

## I. BACKGROUND

Recognizing the dictates of Fed.R.Civ.P. 56(c), we scan the record in the light most congenial to the summary judgment loser and draw all reasonable inferences to his benefit.

In 1974, Radio Corporation of America (RCA) hired plaintiff-appellant Samuel Mesnick, a lawyer by training, to work as a senior contracts administrator at its plant in Burlington, Massachusetts. Mesnick was then fifty-one years of age. He was promoted several times, eventually becoming manager of contracts administration. In 1986, defendant-appellee General Electric Company (GE) purchased RCA's business and installed new management at the Burlington facility. Achilles Georgiou became director of finance, and thus, Mesnick's immediate superior. Georgiou discussed Mesnick's job performance with Mesnick's former supervisors, receiving mixed reviews. Georgiou was told good things about Mesnick's technical competence. He was also told, however, that Mesnick had at times shown himself to be a vulgar, bigoted, sexist lout who insulted subordinates, offended clients, drank to excess during lunch, and so forth. On March 7, 1987, Georgiou wrote his initial evaluation of Mesnick's performance. It was largely negative.[1] In closing, Georgiou suggested that Mesnick ought to "pursue a private career of a federal procurement consultant." Instead of the $4,000 raise that he had anticipated, Mesnick received a $2,000 raise.

Later on, a meeting was held in which Mesnick complained to Georgiou about unfair treatment in these matters. At the same time, the men discussed an expected reorganization of the contracts department (the Department). As part of this reorganization, GE planned to instate a supervisory position, the holder of which would be in charge of departmental operations at both Burlington and GE's facility in Huntsville, Alabama.[2] The new position entailed many of the plaintiff's previous responsibilities. Mesnick expressed an interest in finding out more about the job, although he voiced some reservations about the involvement of "the hanging judge"—an apparent

---

1. Mesnick challenged the fairness of both the unflattering characterizations of his prior service and Georgiou's resultant evaluation. He did not dispute, however, that Pressman, Stockton, and Kupec, Mesnick's bosses during his RCA days, informed Georgiou about a panoply of Mesnick-related problems. Indeed, RCA's management had informed Mesnick himself about certain complaints no later than the winter of 1985–1986.

2. Mesnick first learned of the new position from one of his subordinates, Mark Sherman, who resigned from GE to seek greener pastures. During his exit interview, Sherman was apprised of the realignment by Georgiou and thereafter mentioned it to Mesnick.

reference to Georgiou—in the selection process.

Following this unfruitful meeting, Mesnick attempted to go over Georgiou's head. On April 23, 1987, he sent a memorandum to Salvatore Capodici, the Burlington plant's top executive. In the memorandum, Mesnick remonstrated, generally, about Georgiou's leadership of the Department; complained, specifically, about Sherman's advance knowledge of the new position, *see supra* note 2; and raised the boggart of possible age discrimination. Mesnick's criticism of Georgiou continued in a series of memoranda to, and conversations with, Capodici, and in sundry communications with subordinates. Among other things, he produced and presented for Capodici's edification a slide show belittling Georgiou's performance and capabilities. He also circulated notes to fellow employees exploring the idea of jumping ship and joining a rival company.

Mesnick never applied for the position as manager of the Department. On December 14, 1987, after a national search, GE named Steve Tubbs, age forty-two, to the vacancy. Mesnick was assigned to a different office and given the title of "manager, special projects." His salary and benefits were unscathed, but his new post was under Tubbs and lacked supervisory power over other employees. Left as an emperor without an empire, Mesnick fired off a letter to Capodici explicitly criticizing Georgiou's integrity, professional honesty, and competence.

From that point forward, the situation plunged downhill. On one occasion, upset with Capodici, Mesnick boldly directed profanity at him. On another occasion, Mesnick received a warning from Georgiou in respect to attendance problems. On January 21, 1988, Mesnick filed charges with the Equal Employment Opportunity Commission (EEOC) alleging that GE violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634 (1988), and its Massachusetts analogue, Mass.Gen.L. ch. 151B (1990), by failing to promote him and, instead, hiring Tubbs. GE learned of the charges on January 26, 1988.

That February, Mesnick and his superiors tangled regarding a self-evaluation form that GE asked Mesnick to complete. He adamantly refused, claiming that he was under no obligation to fill out the form. Over the next four months, a bad situation grew steadily worse.[3] Mesnick sent a flurry of memoranda to his superiors roasting Tubbs and Georgiou. These communiques culminated in a missive to Capodici, dated June 22, which requested a formal performance evaluation, excoriated Georgiou's "professional ignorance," and denigrated Tubbs' professional stature. On July 18, 1988, Capodici informed Mesnick that he considered the missive tantamount to "gross insubordination," warned him that his "insubordinate behavior" was "totally unacceptable," and stated that any recurrence would constitute "cause for immediate dismissal."

On the same day, despite his enduring failure to complete the self-evaluation form, Mesnick received a performance evaluation from Tubbs. Tubbs rated Mesnick's overall performance "marginally acceptable." While acknowledging Mesnick's "extensive contractual technical experience," Tubbs stated that these talents were "negated by his lack of interpersonal skills/confrontational attitude, contentiousness, disregard for management direction and policy, and inability/unwillingness to fulfill managerial grade expectations." Mesnick received no merit increase for 1988. Moreover, he was relocated to a smaller office, away from the Department.

Undaunted, Mesnick responded by filing a 20.10 concern in which he branded Tubbs' handling of Mesnick's unauthorized absences as derelict and suggested that Tubbs be fired. After an investigation, Tubbs was exonerated. On September 7, 1988, Mesnick circulated yet another billet-doux. In it he renewed his attack on Tubbs, attempt-

---

**3.** Among other things, Mesnick's attendance problems persisted. On March 28, 1988, Tubbs registered a "20.10 concern" because Mesnick had been absent without noting the absence on his time card. Under internal GE policies, a 20.10 concern is a vehicle for submitting reports anent questionable practices by fellow employees.

ed to rebut the recent (unfavorable) performance evaluation, and alleged that his superiors were retaliating against him because he had preferred discrimination charges. Nine days later, the ax fell: GE terminated Mesnick's troubled tenure on grounds of insubordination and failure to work harmoniously with others. The plaintiff promptly filed another complaint with the EEOC. After the EEOC determined that both complaints were meritless, this suit was instituted.

## II. THE SUMMARY JUDGMENT STANDARD

■ In civil procedure, summary judgment's role is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) (citation omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Since appellate review of a grant of summary judgment is plenary, the court of appeals, like the district court, "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990). An appellate panel is not restricted to the district court's reasoning but can affirm a summary judgment on any independently sufficient ground. *Garside*, 895 F.2d at 48–49. In the end, the entry of summary judgment can be upheld only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

■ The Rule 56 pavane has a distinctive set of steps. When requesting summary judgment, the moving party "must put the ball in play, averring 'an absence of evidence to support the nonmoving party's case.'" *Garside*, 895 F.2d at 48 (quoting *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554). The nonmovant must then document some

factual disagreement sufficient to deflect *brevis* disposition. Not every discrepancy in the proof is enough to forestall a properly supported motion for summary judgment; the disagreement must relate to some genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). Genuine issues of material fact are not the stuff of an opposing party's dreams. On issues where the nonmovant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion. *See Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514–15; *Garside*, 895 F.2d at 48. This evidence "cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989); *see also Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (evidence that "is merely colorable or is not significantly probative" cannot deter summary judgment) (citation omitted).

[4] Over time, summary judgment has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways. Hence, while courts should apply the controlling standards carefully in all cases—and especially in cases that present difficult issues of proof—summary judgment can be appropriately entered even where elusive concepts such as motive or intent are involved. *See, e.g., Medina–Munoz*, 896 F.2d at 8.

## III. THE DISCRIMINATION CLAIM

We consider, first, the claim of discrimination. Although the plaintiff tries to balkanize this claim into several segments—he contends, *inter alia*, that GE violated the ADEA by evaluating his work performance in an unfairly negative fashion, cutting his slated salary increase, impeding his ability to apply for the position of contracts manager, hiring a younger person for that posi-

tion, failing to promote him, demoting him, and terminating him—and the district court analyzed it in that fragmented fashion, *see Mesnick v. General Elec. Co.*, 1991 WL 61481, 55 Fair Empl.Prac.Cas. (BNA) 1291, 57 Empl.Prac.Dec. (CCH) ¶ 40,992 (D.Mass. Apr. 15, 1991), we believe that Mesnick's discrimination case must rise or fall on whether he offered sufficient facts to show that he was wrongfully discharged by reason of his age.[4]

## A.

The plaintiff in an ADEA discrimination suit bears the ultimate "burden of proving that his years were the determinative factor in his discharge, that is, that he would not have been fired but for his age." *Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1335 (1st Cir.1988); *see also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). When, as here, the plaintiff produces no direct evidence of age discrimination, his case is governed in the first instance by the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802–05, 93 S.Ct. at 1824–26. *See Medina–Munoz*, 896 F.2d at 8; *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1010 (1st Cir.1979). It is the judge's province to determine if the respective parties have adduced sufficient evidence to satisfy these burdens. *Dea v. Look*, 810 F.2d 12, 16 (1st Cir.1987).

■ The framework is by now a familiar one. The plaintiff must initially make a prima facie showing of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Medina–Munoz*, 896 F.2d at 8. The burden of making out a prima facie case is "not onerous." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094; *see also Villa-*

*nueva v. Wellesley College*, 930 F.2d 124, 127 (1st Cir.) (the prima facie showing is "quite easy to meet"), *cert. denied*, —— U.S. ——, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991). In an age discrimination case, this requires a demonstration that (i) the plaintiff was over the age of forty, (ii) his work was sufficient to meet his employer's legitimate expectations, (iii) his employer took adverse action against him, and (iv) the employer sought a replacement with roughly equivalent job qualifications, thus revealing a continued need for the same services and skills. *See, e.g., Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1110 (1st Cir. 1989); *Menzel v. Western Auto Supply Co.*, 848 F.2d 327, 328 (1st Cir.1988). This showing gives rise to an inference that the employer discriminated due to the plaintiff's advanced years. *See Freeman*, 865 F.2d at 1335.

■ The next burden—articulating a legitimate, nondiscriminatory reason for the adverse employment decision—belongs to the defendant. *See Hebert*, 872 F.2d at 1111; *Menzel*, 848 F.2d at 328. This entails only a burden of production, not a burden of persuasion; the task of proving discrimination remains the claimant's at all times. *See Burdine*, 450 U.S. at 253, 256, 101 S.Ct. at 1093, 1095; *Medina–Munoz*, 896 F.2d at 9. Once such a reason emerges, the inference raised by the prima facie case dissolves, *Medina–Munoz*, 896 F.2d at 9; *Freeman*, 865 F.2d at 1336, and the last transfer of burdens occurs.

■ At the final stage, the plaintiff is required to show, unassisted by the original inference of discrimination, that the employer's proffered reason is actually a pretext for discrimination of the type alleged.[5] *See Furnco Constr. Corp. v. Wa-*

---

**4.** Without belaboring the point, we note that the plaintiff's other claims of discrimination, to the extent cognizable at all, have been convincingly dispatched in the district court's memorandum of decision. Because the plaintiff did not make out a prima facie case on most (if not all) of those claims, and because the evidentiary hole that sinks the claim of discriminatory discharge, *see infra* Part III(B), is equally fatal to the other claims if reviewed piecemeal, we perceive no point in pursuing an endless series of separate

analyses. There is, however, one exception: in Part IV, *infra*, we examine independently the claim that GE violated the ADEA not by age discrimination, but by retaliating against Mesnick when he complained of such discrimination.

**5.** Some opinions have linked a plaintiff's burden of demonstrating pretext to the strength of the employer's proffered reason. *See, e.g., Loeb*, 600 F.2d at 1012 n. 6 ("The reasonableness of

*ters,* 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978); *McDonnell Douglas,* 411 U.S. at 805, 93 S.Ct. at 1825–26; *Villanueva,* 930 F.2d at 127–28; *Medina–Munoz,* 896 F.2d at 9; *Dea,* 810 F.2d at 15–16. In assessing pretext, a court's "focus must be on the perception of the decisionmaker," that is, whether the employer believed its stated reason to be credible. *Gray v. New England Tel. and Tel. Co.,* 792 F.2d 251, 256 (1st Cir.1986). It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must "elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: age discrimination." *Medina–Munoz,* 896 F.2d at 9; *see also Furnco,* 438 U.S. at 578, 98 S.Ct. at 2950; *Villanueva,* 930 F.2d at 127–28.

■ Because the resultant burden can be carried without direct proof of discrimination, requiring the plaintiff to show that the employer's reason is a pretext for age discrimination comports with the principle that a plaintiff should not be required to produce "smoking-gun" evidence before prevailing in a discrimination suit. There are many veins of circumstantial evidence that may be mined by a plaintiff to this end. These include, but are by no means limited to, statistical evidence showing disparate treatment by the employer of members of. the protected class, *see, e.g., Olivera v. Nestle Puerto Rico, Inc.,* 922 F.2d 43, 49 (1st Cir.1990), comments by decisionmakers which denigrate those over forty, *see, e.g., Siegel v. Alpha Wire Corp.,* 894 F.2d 50, 55 (3d Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990), the incidence of differential treatment in the workplace, *see, e.g., McDonnell Douglas,* 411 U.S. at 804–05, 93 S.Ct. at 1825–26, and the deployment of younger replacements, *see, e.g., Hebert,* 872 F.2d at 1115. Above all, courts will look at evidence of discrimination not in splendid isolation, but as part of an aggregate package of proof offered by the plaintiff. *Olivera,* 922 F.2d at 50.

■ It is important to remain mindful that, when the summary judgment record is complete, the jurisprudence of Rule 56 takes hold and the *McDonnell Douglas* burden-shifting framework must comport with the rule. *See MacDonald v. Eastern Wyo. Mental Health Ctr.,* 941 F.2d 1115, 1122–23 (10th Cir.1991) (Seth, J., writing separately). If the plaintiff has failed to limn a prima facie case, the inference of discrimination never arises, and the employer's motion for summary judgment will be granted. *See, e.g., Menard v. First Sec. Servs. Corp.,* 848 F.2d 281, 285–87 (1st Cir.1988). If the plaintiff has made out his prima facie case, and the employer has not offered a legitimate, nondiscriminatory reason to justify the adverse employment action, then the inference of discrimination created by the prima case persists, and the employer's attempt to secure summary judgment should be rebuffed. *See, e.g., Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094; *Furnco,* 438 U.S. at 577, 98 S.Ct. at 2949. When the struggle has progressed to the third and final phase of burden-shifting, however, then the *McDonnell Douglas* framework falls by the wayside. Because this phenomenon is much misunderstood, we pause briefly to explicate it.

It is settled that the presumption arising from a discrimination plaintiff's prima facie

the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as pretext."); *see also Medina–Munoz,* 896 F.2d at 10; *Menzel,* 848 F.2d at 329–30. Plotting the interrelationship between the plaintiff's burden and the employer's reason in such a manner appears both to square with reality and to fit well with the Court's observation that the *McDonnell Douglas* model "was never intended to be rigid, mechanized, or ritualistic." *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978). After all, if the employer offers a shaky, hard-to-swallow reason for its actions, logic counsels that the plaintiff's follow-on burden should become correspondingly lighter. On the other hand, at the summary judgment stage there remains some unresolved tension between this sliding scale approach and the principles upon which Rule 56 depends. Having noted the dilemma, we may eschew it here, for Mesnick's case cannot withstand the force of the defendant's motion whether or not a sliding scale is used.

case vanishes once the employer has articulated a legitimate, nondiscriminatory reason for dismissing the employee. *See Medina–Munoz*, 896 F.2d at 9; *Freeman*, 865 F.2d at 1336; *Menard*, 848 F.2d at 287. At that juncture, the ultimate question becomes whether, on all the evidence of record, a rational factfinder could conclude that age was a determining factor in the employer's decision. *See United States Postal Serv. Bd. of Govs. v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). That is to say, so long as the employer's proffered reason is facially adequate to constitute a legitimate, nondiscriminatory justification for the employer's actions, the trial court's focus in deciding a Rule 56 motion must be on the ultimate question, not on the artificial striations of the burden-shifting framework.[6]

Put another way, under conventional summary judgment practice, a plaintiff must establish at least a genuine issue of material fact on every element essential to his case in chief. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53. Hence, in a case where the first two steps of the *McDonnell Douglas* pavane have been satisfactorily choreographed, a plaintiff must offer some minimally sufficient evidence, direct or indirect, both of pretext and of the employer's discriminatory animus to prevail in the face of a properly drawn Rule 56 motion. Once the burden-shifting framework has run its course, we think that courts should not unduly complicate matters, whether on summary judgment or on motion for directed verdict at trial's end, "by applying legal rules which were devised to govern 'the basic allocation of burdens and order of proof' in deciding this ultimate question." *Aikens*, 460 U.S. at 716, 103 S.Ct. at 1482 (quoting *Burdine*, 450 U.S. at 252, 101 S.Ct. at 1093) (citation omitted).

■ It is against this backdrop that we move to the particulars of Mesnick's discrimination claim. We realize, as we do so,

that the quantum of evidence a plaintiff must produce to survive a directed verdict at trial, and thus, the quantum necessary to survive a pretrial Rule 56 motion, is not susceptible to formulaic quantification. The determination must be made case by case, in light of the principles undergirding summary judgment, the evidentiary record, and the substantive rules of law applicable in a given instance.

### B.

■ The district court ruled that there was no significantly probative evidence that GE's stated reason for its actions—Mesnick's insubordination and inimicality—masked a discriminatory animus based on Mesnick's age.[7] The plaintiff concedes that this reason, if authentic, would legitimize an adverse employment decision. But, he claims to have adduced proof of both pretext and discriminatory animus, thereby sidestepping summary judgment. We agree in part, for Mesnick created a triable issue of fact anent pretext *vel non*. We disagree, however, as to the second half of the equation. Like the court below, we are unable to find in this record enough evidence of age discrimination to withstand *brevis* disposition. That ends the matter. The "ADEA does not stop a company from discharging an employee for any reason (fair or unfair) or for no reason, so long as the decision to fire does not stem from the person's age." *Freeman*, 865 F.2d at 1341. Courts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions. *See Furnco*, 438 U.S. at 578, 98 S.Ct. at 2950; *Petitti v. New England Tel. & Tel. Co.*, 909 F.2d 28, 31 (1st Cir.1990); *Loeb*, 600 F.2d at 1012 n. 6.

■ To be sure, Mesnick flooded the nisi prius roll with plethoric evidence designed to illustrate his professional compe-

---

**6.** Although, in this posture, the burden-shifting framework itself becomes inconsequential, the court must still examine the evidence that the parties adduced in proceeding under the framework.

**7.** The district court also questioned whether Mesnick had made out a prima facie case on the discriminatory discharge claim. We assume, for argument's sake, that the plaintiff successfully overcame this obstacle.

tence and ability to work well with others—but the vast majority of Mesnick's evidence related to pretext *vel non*. Regardless of its bulk, this evidence had nothing at all to do with age or with the employer's true motives. On that score, Mesnick offered only two isolated tidbits purporting to indicate GE's discriminatory animus. Viewed singly or in combination, these fragments would not allow a rational jury to find that GE had a hidden, age-oriented agenda.

■ The first piece of evidence comprises a comment attributed to Georgiou, on the occasion of Sherman's departure, that he was "sad to lose the youth of the work force." Words of praise for youth—Sherman was in his thirties—do not, by themselves, indicate a bias against more mature workers.[8] *See, e.g., Shager v. Upjohn Co.*, 913 F.2d 398, 400–02 (7th Cir.1990) (superior's mention that "[i]t is refreshing to work with a young man with ... a wonderful outlook on life and on his job" was not probative of age discrimination); *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438–39 (9th Cir.1990) (summary judgment for employer affirmed in ADEA case despite supervisor's comment that he chose plaintiff's replacement because the latter was "a bright, intelligent, knowledgeable young man"); *see also Medina–Munoz*, 896 F.2d at 9–10. While there may be situations in which to laud the young is impliedly to depreciate the old, *Shager*, 913 F.2d at 402–03, Georgiou's remark to Sherman cannot plausibly support an inference of age discrimination in GE's dealings with Mesnick.

■ The second piece of evidence upon which Mesnick fastens is no more rugged. He points to the fact that, when an outside search firm retained by GE reported on potential recruits for the manager's position, it not only furnished the company a roster of candidates, but also listed their ages.[9] Yet, despite ample time for discovery, Mesnick offered no evidence that GE directed the search firm to memorialize applicants' ages or that the company had reason to suspect that the search firm's report, when submitted, would contain such data. Whatever the search firm's reason for collecting ages, the intentions of a third party may not be attributed to an employer without some rational basis for attribution. *See La Montagne v. American Convenience Prods., Inc.*, 750 F.2d 1405, 1412 (7th Cir.1984); *cf. Medina–Munoz*, 896 F.2d at 10 (the biases of one other than the decisionmaker are not ordinarily probative in a discrimination suit). Since there is no basis for attribution here—no evidence, say, that GE requested, or was desirous of receiving, age-related information—the fact that the search firm supplied the applicants' ages does not increase or decrease the likelihood that GE discriminated against the plaintiff because of his years.

To sum up, the district court was under no obligation to draw unreasonably speculative inferences in mulling whether the plaintiff fulfilled his burden of adducing "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. Inasmuch as the summary judgment record contained no evidence from which a rational jury could infer, without the most tenuous insinuation, that GE's legitimate, nondiscriminatory reason for cashiering Mesnick was actually a pretext *for age discrimination*, the district court did not err in defenestrating the plaintiff's claim. *See Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

---

8. The converse, of course, has different ramifications. There are many situations where a superior's slur about persons over forty may well signal a discriminatory motive underlying an employer's decisions. *See, e.g., Olivera*, 922 F.2d at 49 (employer mentioned that poor performance by some of plaintiff's subordinates was due to age); *Siegel*, 894 F.2d at 55 (supervisor commented that "old dogs won't hunt");

*Hebert*, 872 F.2d at 1115 (employer remarked that "it's time we older guys turned over the daily reins to some other group").

9. We note in passing that, under applicable EEOC guidelines, a request for an applicant's age "is not, in itself, a violation of the [ADEA]." 29 C.F.R. § 1625.5 (1990).

## IV. THE RETALIATION CLAIM

Our journey through the record is still incomplete. In addition to claiming that GE discriminated against him by reason of his age, the plaintiff also alleged that GE retaliated against him because he dared to exercise ADEA-related rights. We turn, then, to the question of whether Mesnick presented sufficient evidence to evade summary judgment on his retaliation claim.[10]

### A.

The ADEA provides in pertinent part:

It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment ... because such individual ... has opposed any practice made unlawful by this section, or because such individual ... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C. § 623(d). Absent direct evidence, the *McDonnell Douglas* burden-shifting framework remains the option of choice in retaliation cases, albeit with slight modifications. Under the applicable model, the plaintiff must make a prima facie showing that (i) he engaged in ADEA-protected conduct, (ii) he was thereafter subjected to an adverse employment action, and (iii) a causal connection existed between the protected conduct and the adverse action. *See Connell v. Bank of Boston*, 924 F.2d 1169, 1179 (1st Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2828, 115 L.Ed.2d 997 (1991); *Petitti*, 909 F.2d at 33. The fact that a plaintiff eventually proves unable to establish that the employer violated the ADEA in the first instance is not fatal to his prima facie case of retaliation. It is enough that the plaintiff had a reasonable, good-faith belief that a violation occurred; that he acted on it; that the employer knew of the plaintiff's conduct; and that the employer lashed out in consequence of it. *See Petitti*, 909 F.2d at 33; *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988).

Once a prima facie case is delineated, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. *See McNairn v. Sullivan*, 929 F.2d 974, 980 (4th Cir.1991); *Petitti*, 909 F.2d at 34. If this is accomplished, the ultimate burden falls on the plaintiff to show that the employer's proffered reason is a pretext masking retaliation for the employee's opposition to a practice cast into doubt by the ADEA. *See Dominic v. Consolidated Edison Co.*, 822 F.2d 1249, 1254 (2d Cir.1987); *see also EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1514 (9th Cir.1989) (Title VII retaliation case); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989) (same). As in the discrimination context proper, courts confronted by summary judgment motions must at this point focus on the ultimate question, scrapping the burden-shifting framework in favor of considering the evidence as a whole. *See supra* pp. 824–825; *see also Cerberonics*, 871 F.2d at 458 (in determining whether it is appropriate to take a retaliation case from the jury, a reviewing court's focus must be on "the evidence as a whole"). Thus, the critical inquiry becomes whether the aggregate evidence of pretext and retaliatory animus suffices to make out a jury question.

---

10. The plaintiff asserts nearly two years' worth of grievances as predicates for his retaliation claim. He contends that GE manifested its retaliatory animus by not deputizing him to attend an out-of-town professional conclave, not inviting him to certain staff meetings, refusing to give him information concerning the company's policy on posting job openings, failing to afford him prompt access to documents pertaining to an investigation of pricing practices, delaying his performance evaluation, telling his fellow employees not to discuss work-related matters with him, denying him a salary increase, moving his office, filing a 20.10 concern, terminating him, and, as a final indignity, using false representations to gain possession of documents in his office. Despite this asseverational array, we think the retaliation claim can best be taken as a whole to determine its viability. In all its permutations, the claim falters because of Mesnick's failure to carry his burden of adducing evidence adequate to create a triable issue on GE's retaliatory animus. *See* text *infra*.

There are many sources of circumstantial evidence that, theoretically, can demonstrate retaliation in a way sufficient to leap the summary judgment or directed verdict hurdles. These include, but are not limited to, evidence of differential treatment in the workplace, *see, e.g., Sumner v. United States Postal Serv.*, 899 F.2d 203, 210 (2d Cir.1990); *Dominic*, 822 F.2d at 1254–55, statistical evidence showing disparate treatment, *see, e.g., McDonnell Douglas*, 411 U.S. at 805, 93 S.Ct. at 1825–26, temporal proximity of an employee's protected activity to an employer's adverse action, *see, e.g., Rowlett v. Anheuser-Busch, Inc.*, 832 F.2d 194, 202 (1st Cir. 1987); *Sumner*, 899 F.2d at 209, and comments by the employer which intimate a retaliatory mindset. Whatever the sources of his proof, a plaintiff, in order to survive judgment as a matter of law, must present evidence from which a reasonable jury could infer that the employer retaliated against him for engaging in ADEA-protected activity. *Petitti*, 909 F.2d at 33; *Cerberonics*, 871 F.2d at 458.

### B.

If we assume, *arguendo*, that the plaintiff established a prima facie case of retaliation, then, given the defendant's forceful articulation of a legitimate, nondiscriminatory reason justifying its actions, *see supra* Part III(B), the case boils down to what we have termed the ultimate question: did Mesnick present sufficient evidence that GE's stated reason was a pretext for retaliation? We think the answer to this query is in the negative.

Here, the very chronology of the case militates against a finding that Mesnick's evidence was sufficiently robust to thwart *brevis* disposition. His first complaint of age discrimination was made informally in a memorandum he sent to Capodici on April 23, 1987. Almost nine months later, he filed charges with the EEOC. Not only is this a long gestation period, during which Mesnick's employment remained substantially intact, but GE also offered evidence of insubordination and inimicality that antedated either of these events.

Moreover, after Mesnick first enlisted the EEOC, he remained in GE's employ for another nine months, more or less, before he was finally fired (and then, only after committing a particularly provocative act in outright defiance of an unmistakably aposematic admonition). We think the sequence of events in this case suggests the absence of a causal connection between the statutorily protected conduct and the adverse employment action, not the converse. *Cf., e.g., Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 110–11 (1st Cir.1988) (long period of delay between initial EEOC complaint and ultimate discharge negates inference of retaliation).

In addition to this lack of temporal coincidence, we can find no other competent evidence of retaliation. Mesnick's proof related exclusively to whether business decisions made by the company in its efforts to deal with an employee it perceived as insubordinate were, or were not, plausible. He tendered nothing, direct or circumstantial, suggesting a retaliatory animus. To the contrary, the record, read as a whole, is more consistent with an employer's longstanding desire to improve an employee's behavior than with some sort of vengeful preoccupation. We can, after all, safely conclude, on the basis of undisputed facts, that GE for many months endured conduct on Mesnick's part which was much more antagonistic and disruptive than his eventual resort to the EEOC.

To be sure, GE knew, at the time Mesnick was dismissed, that he was pursuing an age discrimination claim. But, that kind of knowledge on an employer's part, without more, cannot itself be sufficient to take a retaliation case to the jury. Were the rule otherwise, then a disgruntled employee, no matter how poor his performance or how contemptuous his attitude toward his supervisors, could effectively inhibit a well-deserved discharge by merely filing, or threatening to file, a discrimination complaint. We agree with the Eighth Circuit that, while statutes such as the ADEA bar retaliation for exercising rights guaranteed by law, they do "not clothe the complainant with immunity for past and

present inadequacies, unsatisfactory performance, and uncivil conduct in dealing with subordinates and with his peers." *Jackson v. St. Joseph State Hosp.*, 840 F.2d 1387, 1391 (8th Cir.) (Title VII case), *cert. denied*, 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988). In the absence of proof sufficient to create a jury issue regarding retaliation, courts should not use cases involving unsupported reprisal claims to police the wisdom, fairness, or even the rationality of an employer's business judgments.

Because we do not believe a reasonable jury could find in the plaintiff's favor on the issue of retaliatory animus, summary judgment was proper.

## V. CONCLUSION

 We need go no further. The plaintiff's failure to adduce evidence supporting an inference of discriminatory or retaliatory motive was, as the district court perspicaciously discerned, fatal to his case in its several permutations.[11] The defendant's motion for summary judgment was, therefore, appropriately granted.

*Affirmed.*

---

**11.** As framed, the plaintiff's complaint contained parallel claims under federal law and the Massachusetts antidiscrimination statute, Mass. Gen.L. ch. 151B, § 4. In opposing summary judgment, however, the plaintiff relied exclusively on federal precedents. The district court granted summary judgment on all claims, reasoning that, insofar as the state-law counts were concerned, Massachusetts would employ a standard similar to that embodied in the ADEA. In his reply brief on appeal, the plaintiff for the first time attempts to argue that Massachusetts law is more favorably disposed to his claims. We do not consider the legal merits of this argument because we find the point to have been waived. *See Sandstrom v. Chemlawn Corp.*, 904 F.2d 83, 87 (1st Cir.1990) (an argument which is "coherently pulled together for the first time in [a party's] reply brief in [the court of appeals] is procedurally defaulted" and will not be considered); *see also McCoy v. Massachusetts Inst. of Technology*, 950 F.2d 13, 21 (1st Cir.1991) ("It is hornbook law that theories not raised squarely in the district court cannot be surfaced for the first time on appeal.") (collecting cases).