Albert L. DUMOND, et al.

v.

ST. JOSEPH HOSPITAL OF NASHUA.

No. C–91–492–L.

United States District Court,
D. New Hampshire.

Aug. 3, 1994.

Randall E. Wilbert, Wilbert Law Offices, Nashua, NH, for plaintiff.

Byry D. Kennedy, Concord, NH, Joan Ackerstein, Jackson, Lewis, Schnitzler & Krupman, Boston, MA, for defendant.

## ORDER

LOUGHLIN, Senior District Judge.

The plaintiff brought suit alleging that he was wrongfully terminated as an employee of the defendant because of his age in violation of 29 U.S.C. § 621 et seq.

The plaintiff was employed by the defendant from June 15, 1967 until March 15, 1989. The plaintiff was an excellent worker, receiving regular salary increases. Eventually he became Laboratory Manager with forty-three persons working for him full time and sixty-three overall which included part time employees.

The plaintiff's date of birth is February 16, 1939. He was fifty years of age when he was terminated. Immediately after his termination the plaintiff's position was taken for six months by his assistant Wendy Goulder. Thereafter Ms. Carol Montbleau who was under age 40 became plaintiff's successor as Laboratory Manager. Wendy Goulder's date of birth is May 31, 1948 and she candidly admitted that Ms. Montbleau was better qualified than she for the position of Laboratory Manager.

The defendant had, like many hospitals, budgetary problems one of which was overtime. The defendant under the administration of Colonel Clegg had a more benevolent approach to the problem of overtime until the advent of Mr. Ferron as his successor in February of 1986.

There were times that department heads at St. Joseph Hospital had to have employees work overtime. Management would find itself in a "Catch 22" dilemma, overtime due to exigencies was necessary, but at the same time frowned upon because of budgetary constraints. The other alternative in lieu of overtime was to give employees compensatory time off. Compensatory time in lieu of overtime was also frowned upon, but the court finds it was unofficial policy under the Clegg administration and continued with the Ferron administration. Ferron using a more draconian approach, tried to curtail it although the practice continued to be extant to some degree.

Ferron first experienced difficulty with the plaintiff in April, 1987. An employee supervised by the plaintiff filed a grievance for plaintiff's failure to post or consider her for a position which was later filled by a male employee. It was later ascertained that the male employee was less qualified. The plaintiff initially denied the allegations of the female employee, but just before the meeting of the grievance committee admitted that he may have been mistaken. Ferron was then faced with the untoward and embarrassing situation of removing the male employee from the position and posting the position with the grievant. Plaintiff was given a written warning because of this incidence. This was a tocsin as far as Ferron was concerned.

The quietus as far as the defendant was concerned was the incident involving his former wife, Linda Dumond. Linda also worked in the Laboratory on the 3:00 p.m. to 11:00 p.m. shift; the plaintiff worked the day shift. During the week of January 23, 1989 Linda and the plaintiff took a winter vacation at Bretton Woods, New Hampshire. A seemingly innocuous chain of events then occurred which had drastic consequences as far as the plaintiff was concerned.

Linda Dumond's time card showed that she worked 26 hours and the plaintiff gave her compensatory time off in lieu of pay for hours which she had previously worked. In February, 1989 Linda was evaluated by her two supervisors, Deborah Messier and Eileen Murphy. They recommended that Linda receive an annual salary increase of 8%. Plaintiff, having had the authority to do so after receiving remonstrances from Linda, raised it from 8% to 9%.

What followed was unfortunate. Robert Demers was the plaintiff's immediate supervisor. His name was on the evaluation form and his name was forged. The evidence of Joan McCann, a handwriting expert that there was a forgery was cogent and the court accepts the evidence elicited by her testimony. The plaintiff hired a handwriting expert at the not inconsequential expense of $1,500.00, but he or she was not called to testify. Considering all the circumstances involved, the inference is more probable than otherwise that the plaintiff forged Demer's signature, but not evidence beyond a reasonable doubt. There was also strong evidence that Wendy Goulder's initials on the evaluation form were also forged. The handwriting expert was candid in stating that she could not testify as to who may have forged Goulder's initials.

The issue involving the evaluation form was eventually called to the attention of Ferron. Ferron made the decision that the plaintiff should be terminated. The plaintiff brought his discharge before the grievance committee. The grievance committee upheld the actions of Ferron.

### The Aiello Incident

Evidence was presented with respect to Edward Aiello, Director of Respiratory Therapy, who gave two employees compensatory time in lieu of overtime pay. One of the employees complained to the U.S. Department of Labor about not being paid for overtime work. The Labor Department after an investigation made a settlement agreement with the defendant whereby the two employees were paid in the neighborhood of $5,000.00. Aiello was reprimanded, but not fired. He was informed that any such future conduct could result in his dismissal.

It is the contention of the plaintiff that Aiello's misconduct was at least as serious as the plaintiff's and further that Aiello was given the opportunity to discuss the situation with Ferron before he was summarily discharged.

### The Rope Joke

Evidence was also elicited that Elaine Drouin heard a co-worker, Jacqueline Ferro tell the rope joke. In essence the gist of the rope joke was that certain individuals in managerial positions were being given enough rope to hang themselves. Plaintiff was specifically referred to as one of the managers to whom the rope joke applied. Drouin wrote a letter to a member of the Hospital's Board of Directors a copy of which was sent to the hospital attorney. Plaintiff was terminated approximately one month after the Drouin letter was sent.

John Moran was Director of Social Services and was fifty-five years of age when he was terminated, his date of birth was January 10, 1936. Moran never testified that he was terminated because of his age, or was there any other evidence presented to prove that this was the reason for his termination. Moran did testify that he gave his employees compensatory time in lieu of overtime.

James Bowles' date of birth was December 9, 1934. He was the Director of Physical Therapy and was fifty-three years of age when he left St. Joseph's Hospital. Bowles voluntarily resigned his position on April 12, 1988. He resigned because he did not agree with the way Ferron was interfering with his running of his department. It would be di-

singenuous to infer that age was a factor in his resignation as Ferron implored him to reconsider and remain with the hospital. He also testified that he gave his employees compensatory time in lieu of overtime.

It would also be disingenuous to infer that Robert Dion, Director of the Pharmacy, was demoted because he was 60 years of age. At the time Dion ran the pharmacy the hospital license was in his name, not the hospital's. A pharmacist under his supervision was abusing a Class A Drug which is a very serious offense. The DEA became involved. The court finds that the remedial action in demoting not discharging Dion and continuing to pay him the same salary was altruistic. Dion was not called as a witness by either party.

The Equal Employment Opportunity Commission (EEOC) by a determination dated December 19, 1989 stated that he had determined that the evidence obtained during the investigation does not establish a violation of the Age Discrimination In Employment Act (ADEA).

The Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., renders it "unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age...."

█ It is well-settled in this circuit that a plaintiff alleging age discrimination bears the ultimate burden of establishing, by a preponderance of the evidence, that but for his age he or she would not have been discharged. See Mesnick v. General Electric Co., 950 F.2d 816 (1st Cir.1991), cert. denied, — U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); Freeman v. Package Machinery Co., 865 F.2d 1331, 1335 (1st Cir.1988).

█ A Title II ADEA case, like any discrimination case, is difficult to establish by direct evidence, and evidence is therefore often shown indirectly or circumstantially. See Branson v. Price River Coal Co., 627 F.Supp. 1324, 1328–29 (D.Utah 1986), aff'd 853 F.2d 768 (10th Cir.1988). Because of the nature of such cases, the Supreme Court set forth an allocation of burdens formulation in

a Title VII race discrimination case to afford plaintiffs a fair and reasonable method to prove their cases. *Id.* This seminal case in Title VII discrimination suits is *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The fact that *McDonnell Douglas* involved a Title VII case and this is a Title II case is without consequence in allocating burdens since both types of discrimination cases confront the same problems with proof. *See e.g., Branson*, 627 F.Supp. at 1328–29; *Schwager v. Sun Oil Co.*, 591 F.2d 58, 60 (10th Cir.1979); *Dartt v. Shell Oil Co.*, 539 F.2d 1256 (10th Cir.1976), *aff'd*, 434 U.S. 99, 98 S.Ct. 600, 54 L.Ed.2d 270 (1977).

In a very recent case from this circuit, *Biggins v. The Hazen Paper Company*, 1993 WL 406515 (1993), the proper test in cases such as this is set forth.

> Under the *McDonnell Douglas* approach a plaintiff must first establish, by a preponderance of the evidence, a "prima facie" case of ... discrimination.... A prima facie case raises a presumption of discrimination which, if not rebutted, will result in the entry of judgment for the plaintiff.... Once the plaintiff has made out the elements of a prima facie case, his employer must produce an explanation to rebut the presumption of discrimination raised by the prima facie case ... To do this the employer must come forward with evidence that its decision was made "for a legitimate, nondiscriminatory reason...." After the employer has articulated one or more legitimate, nondiscriminatory reasons for its actions, the shifted burden of production becomes "irrelevant" and "the presumption raised by the prima facie case is rebutted" and "drops from the case...." At this point the burden shifts back to the plaintiff to demonstrate that his employer's proffered reasons were a pretext for ... discrimination. (citations omitted).

■ The plaintiff has established a prima facie in accordance with the precepts of the First Circuit. First, the plaintiff is a member of the protected class as he is over forty years of age. Secondly, he was an excellent worker, had received better than average evaluations by the employer thus meeting his employer's legitimate expectations. However, plaintiff was discharged despite his qualifications. He was replaced both on a temporary (six months) and permanent basis by two individuals with roughly similar qualifications.

■ As the plaintiff has established a prima facie case it is then incumbent upon the defendant to rebut the presumption of discrimination by articulating legitimate non-discriminatory reasons for its employment decision to terminate plaintiff's employment. Under this step, the burden of production, not persuasion, shifts to the defendant to articulate "a legitimate, nondiscriminatory reason" for the discharge. *See Loeb v. Textron, Inc.*, 600 F.2d 1003 (1st Cir.1979); *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 9 (1st Cir.1990). Once the defendant proffers at least one legitimate reason, the burden then shifts back to the plaintiff to prove that the stated reason is nothing more than a pretext for unlawful discrimination.

■ The defendant employer has articulated a legitimate, non-discriminatory reason for its decision to discharge the plaintiff. Thus the McDonnell Douglas, presumption "drops out of the picture."

A conglomeration of events such as the Susan Mitchell grievance issue, together with the forging of his ex-wife's time card legitimized a non-discriminatory reason for terminating the plaintiff.

■ The Supreme Court has held that, once the employer succeeds "in carrying its burden of production, the McDonnell Douglas framework—with its presumptions and burdens—is no longer relevant." *St. Mary's Honor Ctr. v. Hicks*, — U.S. —, —, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993) *LeBlanc v. Great American Ins. Co.* 6 F.3d 836 (1st Cir.1993). Thus, in an age discrimination case, once the employer articulates a legitimate, non-discriminatory reason for its decision to discharge the employee, the McDonnell Douglas presumption "drops out of the picture." *Hicks*, — U.S. at —, 113 S.Ct. at 2749. The trier of fact must then simply determine based on all the evidence, whether the employer's decision to terminate the plaintiff was motivated by intentional age

discrimination. *Id.* In reaching this decision, the trier of fact may consider, along with other evidence, whether the employer's justification for its adverse employment action was a pretext. *Id.* Such evidence coupled with the elements of the employee's prima facie case (and, of course, any other evidence), may (or may not) lead the fact finder to infer that the employer has engaged in intentional discrimination. *Id.* *LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 843 (1st Cir.1993). See also *Woods v. Friction Materials, Inc.* 30 F.3d 255 (1st Cir.1994).

During the trial it became evident to the court that the testimony presented was not germane to an age discrimination case, but pertained to a discharge of an employee with twenty-two years of faithful and meritorious service. He had one grievous peccadillo on his record which resulted in his termination. A more humane, less captious supervisor in the court's opinion may have censured or reprimanded the plaintiff with a final warning that further malfeasance would result in plaintiff's termination of employment.

Albeit, it is not the function of this court to censure or inform the defendant how to run its hospital. The plaintiff did not present a preponderance of the evidence whereby this court could make findings that the plaintiff was fired because of his age.

Judgment for the defendant.