Dale BRAMBLE, Plaintiff–Appellant,

v.

AMERICAN POSTAL WORKERS UN-
ION, AFL–CIO, PROVIDENCE LO-
CAL, Defendant–Appellee.

No. 97–1683.

United States Court of Appeals,
First Circuit.

Heard Oct. 6, 1997.

Decided Jan. 27, 1998.

Kevin J. McAllister, Providence, RI, with whom Brennan, Recupero, Cascione, Scungio & McAllister was on brief, for appellant.

Paul F. Kelly, Boston, MA, with whom Anne R. Sills and Segal, Roitman & Coleman were on brief, for appellee.

Before TORRUELLA, Chief Judge, GODBOLD,* Senior Circuit Judge, and BARBADORO,** District Judge.

TORRUELLA, Chief Judge.

Dale F. Bramble sued his employer, the American Postal Workers, AFL–CIO, Providence, Rhode Island Area Local, (the "Union") under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–34, in the Federal District Court of Rhode Island. He alleges that the Union

---

* Of the Eleventh Circuit, sitting by designation.

** Of the District of New Hampshire, sitting by designation.

discriminated against him on the basis of his age when it adopted a new salary structure for his office of Local Union President, effectively eliminating his salary. Bramble brought this suit under both a disparate treatment and a disparate impact theory of recovery. The district court dismissed the case on summary judgment and this appeal followed. *See Bramble v. American Postal Workers Union, AFL–CIO,* 963 F.Supp. 90 (D.R.I.1997). We affirm.

## BACKGROUND

The following facts are essentially undisputed. Bramble, a United States Postal Service ("Postal Service") worker, was first elected to the Union presidency in 1974. For eleven years thereafter, he held the post while working full-time at the postal service. In 1985, the Union voted to make the presidency a full-time position. The Union paid Bramble a $3,000 stipend plus the equivalent of his old salary. In spite of the fact that he was no longer drawing a salary from the Postal Service, Bramble maintained his status as an active Postal Service employee as he continued to hold the presidency.

In November 1991, Bramble was re-elected as the Union president in a close three-way race in which he garnered only 35 percent of the vote. The year following his re-election, Bramble accepted an early retirement package from the Postal Service. At that point, Bramble began drawing a federal pension in addition to his full salary as Union president.

In January 1993, with the majority of the Union opposing Bramble's administration, an amendment to the Union constitution was adopted by a vote of 34–23. The amendment revised the salary structure of the Union presidency from a fixed rate to a rate that was tied to the president's salary as an active Postal Service employee. According to this "active pay status" rate, any Union president receives a $3,000 stipend in addition to the salary he or she would receive in accordance

with his or her active status with the Postal Service.[1]

Pursuant to the new policy, more experienced postal workers serving as president receive higher salaries than less experienced workers holding the same position, while presidents who are retired or on disability receive a mere $3,000 in annual compensation. Because Bramble was retired, the salary he was receiving in addition to the stipend was eliminated. It is also undisputed that Bramble was disliked by many in the union, and that the amendment was intended by many, if not all, of its supporters as a means to force Bramble's resignation. On July 1, 1993, Bramble did just that.

Two weeks later, Bramble brought this suit in the Federal District Court of Rhode Island alleging that the Union's actions amounted to a constructive discharge based upon age discrimination in violation of the ADEA, 29 U.S.C. § 626. Bramble sued the Union in both its capacity as an "employer" and as a "labor union" under the ADEA. Bramble's amended complaint employed both disparate treatment and disparate impact theories of recovery. In his disparate treatment claim, Bramble alleges that the defendant used his eligibility for retirement, a proxy for his age, as a means to force him from office. In his disparate impact claim, Bramble alleges that the new salary structure is a policy which disproportionately affects people protected by the ADEA. The district court dismissed this case on summary judgment, concluding that there was insufficient evidence to create a genuine dispute as to whether the Union was motivated by age-based animus and that business necessity justified the Union's new policy.

## DISCUSSION

### I. Jurisdiction

 As a preliminary matter, the Union claims that this court does not have jurisdiction over this case because the Union is not covered as an "employer" under the ADEA, 29 U.S.C. § 623(a). An employer is only

---

1. The original amendment to the Union constitution was somewhat confusing, but a subsequent amendment was adopted to clarify the "active pay status" policy. The district court opinion refers to this "active pay status" policy as the "no loss, no gain" amendment. *See Bramble,* 963 F.Supp. at 93.

subject to the ADEA if it employs "twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 29 U.S.C. § 630(b). The Union claims that Bramble was its only true employee and that it is thus outside the scope of the ADEA. This argument is bolstered by an examination of the Union's W–3 forms, which reveal that, while over thirty union "employees" received some form of compensation during the years at issue, almost all of these "employees" received less than one thousand dollars per year. While this fact casts doubt on whether twenty or more employees were actually engaged in Union work for each working day in twenty or more calendar weeks, the record at this stage of the case does not contain any schedules or time sheets to indicate when employees were at the Union or engaged in Union duties. Construing this limited record in the light most favorable to Bramble, we must conclude that there is a genuine issue of material fact regarding the qualification of the Union as an "employer" under sections 623(a) and 630. Therefore, it is premature for this court to declare that the district court acted without proper subject matter jurisdiction when it considered the merits of this case for summary judgment purposes.

■■■ Furthermore, " '[i]t is a familiar tenet that when an appeal presents a jurisdictional quandary, yet the merits of the underlying issue, if reached, will in any event be resolved in favor of the party challenging the court's jurisdiction, then the court may forsake the jurisdictional riddle and simply dispose of the appeal on the merits.' " *See Rojas v. Fitch,* 127 F.3d 184, 187 (1st Cir. 1997) (quoting *Hachikian v. FDIC,* 96 F.3d 502, 506 n. 4 (1st Cir.1996)). In light of the fact that summary judgment for the Union is affirmed herein, we are not inclined to remand on jurisdictional grounds.

The Union also argues that it is not required to conform to ADEA requirements because it is not a "labor organization" cov-

ered by section § 623(c). A labor organization under the ADEA represents employees of a covered "employer," and any corporation wholly owned by the federal government is specifically excluded from the ADEA's definition of "employer." *See* 29 U.S.C. § 630(b). However, if the Union is subject to the requirements of the ADEA by virtue of *its* status as an "employer" under section 623(a) and is being sued in that capacity, it is irrelevant whether it also qualifies as a "labor organization" under section 623(c). Thus, the Union's second jurisdictional argument has been mooted by our finding that summary judgment on the issue of subject matter jurisdiction would be premature.

## II. Disparate Treatment

Review of a district court's award of summary judgment is *de novo. See United Nat'l Ins. Co. v. Penuche's, Inc.,* 128 F.3d 28, 30 (1st Cir.1997). We view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor. *See Ahern v. O'Donnell,* 109 F.3d 809, 811 (1st Cir.1997).

■■■ The ADEA was promulgated by Congress out of a concern that older workers were being deprived of employment opportunities due to inaccurate stereotypes. *See EEOC v. Wyoming,* 460 U.S. 226, 231, 103 S.Ct. 1054, 1057–58, 75 L.Ed.2d 18 (1983). To establish a disparate treatment claim under the ADEA, an employee must show that he was treated adversely because of his age. *Mesnick v. General Elec. Co.,* 950 F.2d 816, 823 (1st Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). To survive summary judgment, the employee must first either present direct evidence of discrimination or make out a prima facie case of discrimination, invoking the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973). *See Mesnick,* 950 F.2d at 823. In this case, there was no direct evidence of discrimination.[2]

2. Bramble argues that some direct evidence of discrimination did exist in this case. He points to a comment made by a union member on the floor prior to the vote on the amended salary structure, referring to Bramble as "the retired President." However, this comment plainly provides no evidence of age discrimination.

Therefore, Bramble was required to make out a prima facie case demonstrating that (1) he was over the age of forty; (2) his work was sufficient to meet his employer's legitimate expectations; (3) his employer took adverse action against him; and (4) the employer sought a replacement with roughly equivalent job qualifications, thus revealing a continued need for the same services and skills. *See id.* (citing *Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1110 (1st Cir. 1989)).

■ Bramble's claim was different from most age discrimination claims insofar as he held an *elected* office. He was employed collectively by the union members. This obviously complicated Bramble's task of showing discriminatory animus on the part of his employer. The decision to constructively discharge Bramble was made by a majority of the 57 members of the union electorate who voted on the amendment, and, as courts are acutely aware, determining the "motive" behind a policy adopted via popular vote is a monumental challenge. *See e.g., O'Brien v. United States*, 391 U.S. 367, 383–84, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968) ("[i]nquiries into congressional motives or purposes are a hazardous matter"). For example, the requirement that Bramble's work be "sufficient to meet his employer's legitimate expectations" effectively became a requirement that Bramble be a successful politician. Here was where Bramble's improbable effort to prove age discrimination on the part of an entire union electorate ultimately failed.

Dale Bramble eventually lost favor with his Postal Worker constituents. Bramble's counsel may have stated it most succinctly when he stated that "there were a lot of people in the Union who did not like him." After nineteen years as the Union President, Bramble's counsel explained, he had made enough enemies that "[the Union] wanted to get rid of him for several reasons." For over a year, Bramble had continued as President after failing to win a majority in the presidential election, and there is no evidence that his popularity was increasing. The transcript of the Union meeting at which the

amendment was adopted reveals that Bramble was perceived by various members of the Union as being insulated, greedy, uncommunicative, and generally untrustworthy. It is not for this or any court to determine the character of the plaintiff in this case, but it is relevant that the Union members were critical of their President. None of the members who spoke out against Bramble on that evening criticized him as being too old for his job. In the face of this evidence that the majority of the union members were displeased with Bramble's presidency, and due to the lack of any evidence to the contrary, we reject Bramble's claims of disparate treatment. In essence, he failed to establish a key element of his prima facie case of disparate treatment—that "his work was sufficient to meet his employer's legitimate expectations." [3]

■ Bramble argues that even if the Union wanted to oust him as president for reasons other than age, it violated the ADEA when it implemented its new "active pay status" salary plan. He alleges that the plan "constitutes a form of overt discriminatory animus" because retirement status is tied to age. Essentially, Bramble argues that because older people are the only people eligible for retirement, and because the new salary structure would have the primary effect of discouraging retired people from seeking the Union presidency, the new salary structure is per se age discrimination. However, Bramble's argument fundamentally misinterprets *Hazen Paper v. Biggins*, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993), the most recent Supreme Court case on this issue.

In *Hazen Paper*, the Court considered "whether an employer violates the ADEA by acting on the basis of a factor, such as an employee's pension status or seniority, that is empirically correlated with age." *Id.* at 608, 113 S.Ct. at 1705. In holding for the employer in that case, the Court clarified that "there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age." *Id.* at 609, 113 S.Ct. at 1705. The reasoning

---

**3.** The Union has since amended its constitution to provide for run-off elections so that no Presi-

dent will ever again be elected without winning a majority vote.

behind the Court's decision was that "age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'" *Id.* at 611, 113 S.Ct. at 1707.

Despite Bramble's attempts to distinguish pension status from "active pay status," the analysis under the ADEA must be the same. While retired postal workers likely outnumber those postal workers on disability or unpaid leave, the fact remains that the group negatively affected by the active pay status policy is "analytically distinct" from the group of retirement aged postal employees. In other words, there is a positive correlation between active pay status and age, but one is not an exact proxy for the other.

*Hazen Paper* explains that where an employment decision is premised upon an age-correlated but analytically distinct factor, a violation of the ADEA has occurred only if there is additional evidence that the employer was motivated by an age-discriminatory animus. *Id.* at 612–13, 113 S.Ct. at 1707–08. As discussed above, there is no such evidence in this case. The plaintiff's disparate treatment claim must fail.

### III. Disparate Impact

■ Bramble also claims that the Union's new salary structure has a "disparate impact" on older persons in violation of the ADEA. A "disparate impact" claim involves "'employment practices that are facially neutral in the treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by a business necessity.'" *Hazen Paper,* 507 U.S. at 609, 113 S.Ct. at 1705, *quoting Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977). Statistics comparing persons holding at-issue jobs and composition of qualified job applicants are commonly a basic component of a disparate impact claim. *See Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 650–51, 109 S.Ct. 2115, 2121–22, 104 L.Ed.2d 733 (1989). As the Supreme Court has repeatedly reminded, there has been no definitive interpretation of the applicability of dis-

parate impact analysis to the ADEA. *See Hazen Paper,* 507 U.S. at 610, 113 S.Ct. at 1706; *Markham v. Geller,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981) (Rehnquist, J., dissenting from denial of certiorari). Furthermore, this Court has never addressed the question. However, this case does not present this Court with a proper occasion to take up the question, because, even assuming *arguendo* that these claims are viable under the ADEA, it is plainly apparent that Bramble has insufficient evidence to support his claim.

■ In this case, the effect of the questioned employment practice has not fallen on a group at all, but on one person. Only the president's salary was modified by the amendment. Thus it is undisputed that the only person affected by the active pay status policy was Bramble. Where an employer targets a single employee and implements a policy which has, to date, affected only that one employee, there is simply no basis for a disparate impact claim.

■ Instead, it appears that Bramble's claim is actually prospective, i.e., he argues that it is apparent "on its face" that the active pay status policy *will have* a foreseeable disparate impact. However, proper disparate impact claims only involve facially *neutral* policies. *See Hazen Paper,* 507 U.S. at 609, 113 S.Ct. at 1705–06. Therefore, Bramble's disparate impact claim actually folds into his failed disparate treatment claim. *See supra.* Thus, we need not address whether the Union had shown a "business necessity" for its new policy, the issue which persuaded the district court to grant summary judgment on this disparate impact claim. *See Bramble,* 963 F.Supp. at 98–102.

### IV. Reasonable Notice

■ Bramble argues that the district court's award of summary judgment failed to meet the requirements of Fed.R.Civ.P. 56(c) entitling the party opposing summary judgment to ten days notice and an opportunity to respond. *See Stella v. Town of Tewksbury,* 4 F.3d 53, 56 (1st Cir.1993). He argues that the district court awarded summary judgment on two grounds that were not discussed in the Union's Motion for Summary

Judgment—namely that there was no evidence of discriminatory animus as required by *Hazen Paper* and that the Union had established a business necessity for its new salary structure. Bramble contends that the ruling thus conflicted with the well-established principle that a trial court must give notice to both parties of any issues it will be considering for summary judgment that exist outside of the original Motion for Summary Judgment. *See Stella*, 4 F.3d at 56.

■■■■■ " 'The purpose of Rule 56(c) is to allow a party to have a meaningful opportunity to challenge a summary judgment motion.' " *Delgado–Biaggi v. Air Transport Local 501*, 112 F.3d 565, 567 (1st Cir.1997) (quoting *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 409 (1st Cir. 1985)). Indeed, where a party did not have an adequate opportunity to address the rationale behind the summary judgment in the district court, we will not address the substance of the claims on appeal because " 'leapfrogging to the merits would display much the same disregard for established protocol that marred the district court's performance.' " *Delgado–Biaggi*, 112 F.3d at 568 (quoting *Stella*, 4 F.3d at 55). However, while a party must receive an adequate opportunity to challenge the general grounds of a prospective award of summary judgment, a party need not have an opportunity to address every step of the reasoning employed or every case relied upon by the district court. In this case, Bramble filed two briefs over the course of two months in which he attempted to distinguish *Hazen Paper*, the case on which the district court and this court ultimately rely in dismissing Bramble's disparate treatment claim. Since his disparate impact claim merely extends from this failed disparate treatment claim, Bramble's inability to successfully distinguish *Hazen Paper* was fatal to both claims. Thus we reject Bramble's argument that he was denied reasonable notice.

For the reasons stated herein, the district court's award of summary judgment is *affirmed.*