ERIE COUNTY RETIREES ASSOCIA-TION and Lyman H. Cohen, for himself and all others similarly situated, Plaintiffs,

v.

The COUNTY OF ERIE, PENNSYL-VANIA and Erie County Employees' Retirement Board, Defendants.

Civil Action No. 98–272.

United States District Court, W.D. Pennsylvania, Erie Division.

. Sept. 30, 1999.

Daniel J. Pastore, The McDonald Group, Erie, PA, for Plaintiffs.

Richard A. Lanzillo, Knox, McLaughlin, Gornall & Sennett, Erie, PA, John E. Cooper, Erie, PA, for Defendants.

### MEMORANDUM OPINION

McLAUGHLIN, District Judge.

Plaintiffs, the Erie County Retirees' Association and Lyman H. Cohen, filed this action on behalf of Mr. Cohen and all other similarly situated former employees of the County of Erie, Pennsylvania, ages 65 and older, who are receiving health insurance coverage from the County under the Highmark "SecurityBlue" health insurance plan. Plaintiffs contend that the County violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq., when it required Plaintiffs to either accept coverage under the SecurityBlue Plan or forego health insurance coverage from the County altogether. Plaintiffs commenced this action by filing a two-count complaint which asserts claims under both the ADEA and various state law theories of liability.

Presently pending before the Court are the parties' cross-motions for partial sum-

mary judgment on the ADEA claim.[1] Jurisdiction over this action is being exercised pursuant to 28 U.S.C. §§ 1331 and 1367(a). Because we conclude that the ADEA does not provide the specific protection sought by Plaintiffs, we will deny Plaintiffs' motion and grant partial summary judgment in favor of the Defendant.

### I. BACKGROUND

Plaintiffs in this action are a class of retired employees of the County of Erie, ages 65 and older (and their spouses), who are currently receiving health insurance benefits from the County under Highmark's SecurityBlue health insurance plan. The gravamen of the complaint is that, because of their age, the Plaintiffs have been treated adversely with respect to their health insurance coverage as compared to those retirees under the age of 65. For purposes of context, we provide some background facts.

Effective January 1, 1972, the County implemented an official policy whereby persons employed by the County for at least 8 years would be entitled to hospitalization insurance benefits throughout their retirement. The policy was a change from the County's previous practice of providing hospitalization benefits only to active employees.

Beginning in 1987, the County began purchasing insurance coverage from Blue Cross/Blue Shield of Western Pennsylvania, now known as "Highmark Blue Cross/Blue Shield." Historically, health care benefits were provided to both active employees and eligible former employees through one of at least three different coverage "groups": the "00" group, consisting of current employees; the "01" group, consisting of "Medicare eligible" retirees; and the "02" group, consisting of "non-Medicare eligible retirees." These

1. Although the Complaint names both the County and its Employees' Retirement Board as Defendants, for purposes of their instant motion Plaintiffs assert their ADEA claim only against the County.

groups had separate but similar traditional indemnity health insurance plans.

Due to the dramatic increase in the cost of health insurance which ensued over the years, the County Employees' Retirement Board (hereinafter, the "Board" or the "Retirement Board") later re-evaluated the extent to which it was willing to provide continued health insurance benefits to former employees. The Board determined on January 23,1992 that County employees hired after that date would not be eligible to receive any hospitalization benefits upon retirement. All of the class members in this action were hired prior to the January 1992 cut-off date and so remained eligible to receive retirement health benefits.

The Board further restricted eligibility for such benefits in a vote taken on December 12, 1995. On that date, the Board reaffirmed its decision that no employees hired after January 23, 1992 would be eligible for hospitalization benefits upon retirement. In addition, with respect to those employees (like Plaintiffs) hired prior to January 23, 1992, the Board determined that eligibility for such benefits would be restricted to the following groups:

(a) employees who were unable to continue as County employees due to a disability and who would otherwise be eligible for a disability retirement pension under the County Pension Code;

(b) employees who retired from the County government after having accumulated at least 20 years of service with the County and were 55 years of age;

(c) employees who were involuntarily terminated from County government after having accumulated at least 8 years of service with the County; and

(d) employees who retired from the County after having accumulated at least 8 years of service with the County and were 60 years of age.

All of the class members remained eligible for retirement benefits under these restrictions.

Up until October 1997, the entity primarily responsible for selecting health insurance programs for eligible retirees was the Retirement Board. Premiums for retiree insurance coverage had been funded up to that point by the "excess interest" generated by the County's pension funds.[2] However, in 1997, a change in government accounting standards eliminated "excess interest" as a source of funding for retiree insurance coverage. Accordingly, beginning in 1998, retiree insurance coverage became part of the regular County budget and the County assumed responsibility for the selection of retiree health care plans.[3]

Meanwhile, since at least 1996, County officials had begun exploring ways to further reduce the cost of providing health insurance to its retirees and employees. By late 1997 officials from the County and its Retirement Board, having engaged in a review and evaluation of the relative costs and benefits of the existing health care plans, decided that the changes would be mandated in the health benefits provided to retirees. In November 1997, Highmark announced its intent to increase the County's annual premiums for medical insurance coverage by an average of 48 percent. The prospect of this significant increase in

---

**2.** "Excess interest" is the amount of income generated each year by the pension funds which is above and beyond the amount necessary to cover the pension obligations and legally mandated reserves.

**3.** Plaintiffs contend that this change in accounting did not in any way affect the County's cost of providing health care benefits or its decision to alter Plaintiffs' benefits. According to Plaintiffs, the monies that had formerly been characterized as "excess income," although no longer designated as such, are still available to the County and are used to offset the County's annual contribution to the retirement fund. To the extent there is any genuine dispute on this point, it is immaterial to our resolution of the instant motions.

medical insurance premiums heightened the perceived need for a re-evaluation of existing health insurance options.

Accordingly, in the Fall of 1997, the County determined that, effective February 1, 1998, it would provide coverage under the "SecurityBlue" Plan to all former employees of the County who were eligible for continuing benefits and who qualified for coverage under the SecurityBlue Plan. Essentially, these former employees had to either accept coverage under the SecurityBlue Plan or forego any retirement health insurance benefits from the County.

SecurityBlue is a coordinated health care plan provided through Keystone Health Plan West, Inc., a federally qualified health maintenance organization ("HMO"), and a contract with Medicare. SecurityBlue is available to persons who have Medicare Part B Medical Insurance and who live in the SecurityBlue "service area."[4] This Plan differs from a traditional indemnity plan primarily in that the health care needs of each member are coordinated by his or her primary care physician ("PCP"), who is selected from a list of physicians provided in the SecurityBlue Provider directory. The PCP is responsible not only for administering care, but also for making referrals to specialists and arranging for hospitalization. Some degree of individual choice is lost under this Plan inasmuch as a member's PCP must be selected from a list of physicians within the SecurityBlue network and coverage is available only for services provided or authorized by the insured's PCP. In most cases, the SecurityBlue Plan does not pay for services that are not authorized by the insured's PCP.[5] The trade-off for this loss of choice is that, unlike the traditional indemnity plan, the SecurityB-lue Plan has no deductibles and little or no co-payment obligation; generally, 100 percent of the covered services are paid for.[6] In addition, SecurityBlue covers pre-existing conditions without a waiting period and also provides benefits for some services—such as eye examinations, dental visits and hearing aids—that are not available under traditional indemnity plans or Highmark's SelectBlue point-of-service plan (discussed below). However, SecurityBlue members must continue to pay Medicare Part B Medical Insurance premiums.

Despite the change in health care benefits for those retirees eligible under the SecurityBlue Plan, the County did not immediately alter the benefits available to its other retirees. For example, former employees still residing in Western Pennsylvania who were not Medicare eligible, and therefore not eligible for SecurityBlue coverage, continued to receive health insurance benefits under the old traditional indemnity plan until October 1, 1998, when they began receiving coverage under the Highmark "SelectBlue" Plan. The Select-Blue Plan differs from SecurityBlue in that it is a hybrid "point-of-service" plan which combines the features of an HMO with those of a traditional indemnity plan. Under SelectBlue an insured can, for any health care incident, select either the HMO option (and accept its benefits and limitations) or the traditional indemnity option. In order to be eligible for Select-Blue, a retiree must be non-eligible for Medicare and must live in the SelectBlue service area.

Plaintiffs maintain that they have been discriminated against in violation of the ADEA as compared to retirees under the age of 65 who, Plaintiffs claim, have received superior health care coverage. This

---

4. The SecurityBlue service area covers most of Western Pennsylvania and includes the following counties: Allegheny, Armstrong, Beaver, Bedford, Blair, Butler, Cambria, Erie, Fayette, Greene, Indiana, Lawrence, Mercer, Somerset, Washington and Westmoreland.

5. The Plan makes an exception in the case of "emergencies and urgently needed care outside the service area." (Append. in Supp. of Pl.s' Mot. for Summ. Judg. [Doc. No. 18] at 78.)

6. For some services, a $10.00 co-payment is required under SecurityBlue.

argument actually involves comparison of the two groups with respect to two different time periods: (a) February 1, 1998 to October 1, 1998; and (b) October 1, 1998 to present. With respect to the first period, Plaintiffs claim they received inferior health care coverage because they were essentially forced to accept coverage under the SecurityBlue Plan, while retirees under the age of 65 continued to receive coverage under the traditional indemnity insurance plan. With respect to the second time period, Plaintiffs contend that their health care insurance coverage under the SecurityBlue Plan was inferior to that offered younger retirees under the Select-Blue Plan.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In order to withstand a motion for summary judgment, the non-moving party must "make a showing sufficient to establish the existence of [each] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating whether the non-moving party has established each necessary element, the Court must grant all reasonable inferences from the evidence to the non-moving party. *Knabe v. Boury Corp.,* 114 F.3d 407, 410, n. 4 (3d Cir.1997) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (quoting *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348).

## III. DISCUSSION

The ADEA broadly proscribes age-based discrimination in employment by (among other things) making it unlawful for any employer:

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; [or]

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age.

29 U.S.C.A. § 623(a) (West 1999).

Plaintiffs contend that the County violated the ADEA by maintaining a facially discriminatory policy whereby Plaintiffs were offered an inferior health insurance plan on account of their age. Plaintiffs further posit that the County's health insurance policy fails to comply with the requirements of the Older Workers Benefit Protection Act of 1990 ("OWBPA"), which, *inter alia,* amended Section 4(f)(2) of the ADEA, 29 U.S.C.A. § 623(f)(2) (West 1999).

As it relates to employee benefit plans, § 4(f)(2) currently provides that it "shall not be unlawful for an employer"

(2) to take any action otherwise prohibited under subsection (a), (b), (c), or (e) of this section -

\*     \*     \*     \*     \*     \*

(B) to observe the terms of a bona fide employee benefit plan -

(i) where, for each benefit or benefit package, the actual amount of payment made or cost incurred on behalf of an older worker is no less than that made or incurred on behalf of a younger worker, as per-

missible under [29 C.F.R. § 1625.10] ...

29 U.S.C.A. § 623(f)(2)(B)(i) (West 1999). The purpose behind § 4(f)(2) is "to permit age-based reductions in employee benefit plans where such reductions are justified by significant cost considerations." 29 C.F.R. § 1625.10(a)(1) (1998). In such cases:

> benefit levels for older workers may be reduced to the extent necessary to achieve approximate equivalency in cost for older and younger workers. A benefit plan will be considered in compliance with the statute where the actual amount of payment made, or cost incurred, in behalf of an older worker is equal to that made or incurred in behalf of a younger worker, even though the older worker may thereby receive a lesser amount of benefits or insurance coverage.

*Id.* Section 4(f)(2)(B)(i) of the ADEA in its present form specifically codifies this "equal cost/ equal benefit" rule. 29 U.S.C.A. § 623(f)(2)(B)(i) (West 1999).

At this point, it is important to clarify the nature of the Plaintiffs' claims. In their complaint, Plaintiffs allege they are being treated adversely on account of their age as compared to both (a) younger (i.e., under age 65) retirees *and* (b) active employees of the County. However, for purposes of their motion for summary judgment, Plaintiffs are *not* presently challenging the disparity in County-provided health insurance benefits as between *active and retired* employees. Instead, for purposes of their instant motion, Plaintiffs ask the Court to focus only on the group of retirees eligible for continued health insurance benefits under the Board's December 12, 1995 resolution.[7] As to that group, Plaintiffs contend that

the County has violated the OWBPA because, under the SecurityBlue plan, the County is actually spending less on health insurance benefits for older retirees and, at the same time, providing them an inferior health insurance plan. The County has essentially confined its response to the issues raised in the Plaintiffs' motion for summary judgment. We will likewise limit our focus to the alleged disparity being accorded to the two groups of retirees.[8]

That having been said, the County contends that its policy does not implicate the ADEA, as amended by the OWBPA. According to the County, its decision to place Plaintiffs in SecurityBlue was based not on age, but rather, on consideration of three factors: (1) the insured's status as active or inactive; (2) cost; and (3) the availability of plans. Thus, a threshold challenge is raised by the County as to whether the Plaintiffs have even made out a prima facie case under the ADEA.

We must first attempt to clarify what the County's "policy" actually was concerning its placement of individuals into the various health plans. Plaintiffs suggest it was the County's policy to segregate former employees, ages 65 and older, and essentially force them to either take health care coverage under the SecurityBlue Plan or forego County-provided coverage altogether. Yet it is undisputed that the triggering feature for SecurityBlue coverage was, and is, eligibility for Medicare Part B Medical Insurance, coupled with the proviso that the insured must reside in the SecurityBlue service area. While age is one factor that triggers eligibility for Medicare coverage, it is not the only one, because individuals may be eligible for Medicare if they are disabled. In fact, the record shows that at least some retirees

---

7. Henceforth in this opinion, when the Court discusses health insurance benefits as they relate to former County employees, it will implicitly be referring to those County retirees who were eligible for continued health insurance coverage under the December 12, 1995 resolution.

8. Accordingly, the Court's ruling in this Memorandum Opinion and Order does not attempt to resolve any remaining aspect of the Plaintiffs' ADEA claim.

under the age of 65 were placed in the SecurityBlue Plan on account of their disability, not their age. The County also notes that Medicare-eligible retirees residing outside of the SecurityBlue service area are not eligible for SecurityBlue, and therefore remain covered under the former traditional indemnity plan.

We conclude that there is no genuinely disputed issue of fact as to the nature of the County's policy of providing health care benefits to its former employees. The undisputed evidence shows that former employees who were eligible for continuing health care coverage under the terms of the Retirement Board's December 12, 1995 resolution were offered coverage under the least expensive plan (that is, least expensive to the County) for which they qualified. Consequently, retirees who were Medicare-eligible were placed in SecurityBlue if they lived in the applicable service area. Those retirees who lived in the SelectBlue service area but who were not Medicare-eligible (either by virtue of age or disability) were placed in Select-Blue. Those retirees who did not qualify for SecurityBlue or SelectBlue (e.g., those who maintain residence outside of Western Pennsylvania) were offered health insurance under the traditional indemnity plan.

Based on these undisputed facts, the County contends that its policy does not implicate the ADEA at all. In short, the County asserts that age was not a determinative factor in its decision as to what health plans would be offered to its current and former employees. To the extent the ADEA is implicated here, the County asserts the Act's affirmative defense which applies where adverse employment decisions are based on "reasonable factors other than age." *See* 29 U.S.C.A. § 623(f)(1) (West 1999).

### Is the ADEA Implicated?

In arguing that Plaintiffs have failed to make a *prima facie* showing of an age-based employment action, the County relies chiefly on the Supreme Court's decision in *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). In *Hazen,* the plaintiff was a 62–year old technical director of a paper company who was fired by his employer just several weeks shy of the date on which his pension benefits would have vested. The company had a policy under which benefits vested after an employee accrued 10 years of service. The Supreme Court held that the employer's deliberate effort to interfere with Mr. Biggins's pension by firing him shortly before his benefits vested—although a violation of ERISA—was not a violation of the ADEA. 507 U.S. at 609, 612–13, 113 S.Ct. 1701. The Court observed that, while age and an individual's years of service may be correlated to a degree, they were analytically distinct from one another because a younger individual who remained with the same employer could vest after 10 years of service while a newly hired older worker with fewer years of service might not be vested. *Id.* at 611, 113 S.Ct. 1701. The Supreme Court emphasized in *Hazen Paper* that the ADEA is not violated when a decision is wholly motivated by factors other than age. *Id.*

The County also relies on *Bramble v. American Postal Workers Union, AFL–CIO Providence Local,* 135 F.3d 21 (1st Cir.1998). That case involved a claim by the president of a local office of the American Postal Workers Union that the Union had violated the ADEA when it reduced his salary based on his status as a nonactive postal employee. In *Bramble,* the Union had amended its constitution and revised the salary structure for the union presidency from a fixed rate to a rate that was tied to the president's salary as an active employee. In accordance with this policy, Dale Bramble, having taken an early retirement from his job as a postal worker, was entitled to receive only a $3,000.00 stipend as union president, whereas a worker on "active" status and serving as union president would have received the $3,000 plus his or her full salary. The First Circuit held, based on the

ruling in *Hazen Paper*, that the Union's policy did not violate the ADEA, since the distinguishing characteristic at issue was "non-active status"—a factor analytically distinct from age, and one which included individuals other than retirees. The court observed that "[w]hile retired postal workers likely outnumber those postal workers on disability or unpaid leave, the fact remains that the group negatively affected by the active pay status policy is 'analytically distinct' from the group of retirement aged postal employees. In other words, there is a positive correlation between active pay status and age, but one is not an exact proxy for the other." 135 F.3d at 26.

Having examined the foregoing authority, this Court is not persuaded that *Hazen* and *Bramble* control the outcome of this action. Those cases involved decisions based on factors (*viz.*, years of service and inactive status) that were clearly analytically distinct from (although correlated to) age. Here, however, when we focus on the disparate treatment as between Plaintiffs and the other County retirees, the distinction becomes far less clear. Medicare eligibility and residency within the SecurityBlue service area are both necessary— i.e., "but for"—conditions for receiving coverage under the SecurityBlue plan. To the Court's knowledge, none of the Plaintiffs are disabled so as to be independently eligible for Medicare on that basis. Rather, for the Plaintiffs, eligibility for Medicare followed ineluctably upon attaining age 65. Plaintiffs' age was a determinative factor in their placement in the SecurityBlue Plan because, if not for their age, they would not be placed in that plan. The non-age factors at issue in *Hazen* and *Bramble,* therefore, are distinguishable.

█ Moreover, extending the rulings of *Hazen* and *Bramble* to this case would require this Court to essentially hold that discrimination in benefits based on an individual's eligibility for Medicare is not an age-related distinction. That is problematic, in the Court's view, because the established law under the ADEA suggests that both Congress and the EEOC felt otherwise. Section 1625.10 of Title 29, Code of Federal Regulations—which is now specifically incorporated into § 4(f)(2)(B)(i) of the ADEA—contains a special provision establishing the narrow conditions under which an employer may comply with the "equal cost/equal benefit" rule while coordinating employee benefits with government provided benefits such as Medicare:

> [a]n employer does not violate the Act by permitting certain benefits to be provided by the Government, *even though the availability of such benefits may be based on age. For example, it is not necessary for an employer to provide health benefits which are otherwise provided to certain employees by Medicare.* However, the availability of benefits from the Government will not justify a reduction in employer-provided benefits if the result is that, taking the employer-provided and Government-provided benefits together, an older employee is entitled to a lesser benefit of any type (including coverage for family and/or dependents) than a similarly situated younger employee. *For example, the availability of certain benefits to an older employee under Medicare will not justify denying an older employee a benefit which is provided to younger employees and is not provided to the older employee by Medicare.*

20 C.F.R. § 1625.10(e) (1998) (emphasis supplied). The highlighted language suggests that Medicare is considered an age-based factor under the regulation, at least where eligibility for Medicare benefits is based on the individual's age. In essence, the regulation indicates that an employer will run afoul of the ADEA if the employer provides a "lesser benefit of any type" (i.e., a form of disparate treatment) to a Medicare-eligible employee in the course of coordinating the employee's Medicare benefits with other, employer-provided

benefits.[9] In such a scenario, the distinguishing characteristic giving rise to the disparate treatment would be the employee's status as a Medicare beneficiary. Section 1625.10(e) thus suggests that Medicare eligibility, when based on a recipient's age, is an age-based factor which implicates the ADEA.[10] We therefore reject the Defendant's suggestion that Plaintiffs have not made a prima facie showing of age-based discrimination.

### Does the Older Worker's Benefit Protection Act Apply to Plaintiffs?

■ Having concluded that the ADEA is at least facially relevant here, we must next consider whether either of the parties is entitled to summary judgment under the Act. Plaintiffs contend that the County violated the ADEA by failing to offer retirement health plans which adhere to the "equal cost/equal benefit" rule as set forth in 29 U.S.C.A. § 623(f)(2)(B)(i) and 29 C.F.R. § 1625.10(a)(1). The County asserts that it is entitled to judgment under § 623(f)(1), which provides an affirmative defense where the subject employment action is based on "reasonable factors other than age." *See* 29 U.S.C.A. § 623(f)(1) (West 1999).[11] Alternatively, to the extent that § 623(f)(2)(B)(i) is applicable, the County argues that it has satisfied the requirements of that provision. The County also disputes Plaintiffs' characterization of the SecurityBlue Plan as inferior and claims that, in any event, the County was powerless, in light of Highmark's underwriting criteria, to offer Plaintiffs the health plan alternatives they desire. Finally, the County argues that, from a policy perspective, Plaintiffs' theory of liability would lead to widespread and severe problems such that judgment in favor of the defense is warranted. We conclude that the County is ultimately entitled to judgment for a different reason: *to wit,* assuming *arguendo* that the SecurityBlue Plan provides Plaintiffs with lesser benefits than are provided to younger retirees (an issue which we need not and do not decide), this alleged disparity is not the type of discrimination which was meant to be prohibited by § 4(f)(2)(B)(i) of the ADEA, as amended by the Older Workers Benefit Protection Act.

Before expounding on this issue, however, some brief commentary is warranted regarding the procedural posture of this case. In its initial summary judgment brief, the County indicated, without further elaboration, that it "disputes that retirees are 'individuals' within the meaning of [29 U.S.C.] Section 623(a)(1)." (Br. of Def. in Opp. to Pl.s' Mot. for Partial Summ. Judg. and in Supp. of the County's Cross–Mot. for Summ. Judg. [Doc. No. 27] at 24 n. 12.)[12] The County also disputed the applicability of 29 U.S.C. § 623(f)(2)(B)(i) to retirees. (*Id.* at 27 n. 14.) The Court did not initially focus its attention on these issues. Nevertheless, in the course of researching the merits of the parties' arguments (and attempting to bet-

9. In light of our ruling, we would interpret this regulation as applying only to active employees where the issue of health benefits is concerned.

10. Our conclusion is not changed by the fact that Plaintiffs, in order to be eligible for SecurityBlue, had to maintain residence in the SecurityBlue service area. Both factors (age-based Medicare eligibility and residence) are necessary, or but-for, factors. Therefore, both factors had a determinative influence on the Plaintiffs' allegedly adverse treatment. Also of no moment is the fact that Plaintiffs had to be within the select group of retirees eligible for continuing benefits under the

Board's January 23, 1992 and December 12, 1995 resolutions. For present purposes, we are comparing only the allegedly disparate treatment being meted out *within* the group of retirees who were eligible for continuing health benefits under 1992 and 1995 resolutions.

11. In light of our conclusion that the Plaintiffs' eligibility for Medicare is an age-based factor, we would likely find this defense inapplicable as a matter of law.

12. This defense was also raised in the County's answer. (*See* Def.'s Answer [Doc. No. 15] at ¶ 56.)

ter understand the intended application of § 4(f)(2)(B)(i) of the ADEA), the Court came across legislative history suggesting that, in fact, retired persons were not entitled to relief under the Act, at least for purposes of challenging any disparities in their retirement health benefits. The Court therefore raised this issue with the parties *sua sponte* and invited further briefing on the issue of whether Plaintiffs, as retired persons, were entitled to protection under the ADEA. Having considered the parties' respective arguments and, in addition, having conducted significant independent research, the Court concludes that Plaintiffs are not entitled under the ADEA to the relief they now seek.[13] We arrive at this conclusion based on consideration of several factors.

### 1. The Language of the ADEA

We begin by considering the statutory language itself. "Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). Whether the meaning of a statutory provision is plain or ambiguous is determined by "reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 341, 117 S.Ct. 843. We must interpret the Act "in a manner which best effectuates Congressional intent and the legislative purpose underlying its adoption." *In re Jaritz Indus., Ltd.,* 151 F.3d 93, 105 (3d Cir.1998) (Mansmann, J., concurring).

The relevant portions of the ADEA for present purposes are § 4(a)(1) and § 4(f)(2)(B)(i). Subsection 4(a)(1) generally prohibits employers from discriminating against "any individual" with respect to the individual's compensation, terms, conditions, or privileges of employment, including employee benefits. 29 U.S.C.A. § 623(a)(1) and § 630(*l*) (West 1999). Under § 4(f)(2)(B)(i), however, a limited exception is provided under which an employer may justify age-based disparities in employee benefit plans based on cost factors. Under this limited exception, an employer may distinguish between "older workers" and "younger workers" in terms of the employee benefits offered, "where, for each benefit or benefit package, the actual amount of payment made or cost incurred on behalf of an older worker is no less than that made or incurred on behalf of a younger worker, as permissible under section 1625.10, title 29, Code of Federal Regulations (as in effect on June 22, 1989)." *See id.* § 623(f)(2)(B)(i). Plaintiffs, of course, contend that their ADEA rights were violated by the County's failure to abide by this limited "equal cost/equal benefit" exception. Thus, the narrow question we must address is whether § 4(f)(2)(B)(i) of the ADEA provides protection to retired persons, like Plaintiffs, who seek to challenge the disparities provided by employers in retiree health benefits.

Notably, § 4(f)(2)(B)(i) refers to "older workers" and "younger workers," terms that, although undefined in the ADEA, suggest a more narrow and precise scope of protection. Congress did not use in § 4(f)(2)(B)(i) the broader term "employees," *cf.* 29 U.S.C.A. § 623(a)(2), which has been held, in the context of Title VII's anti-retaliation provision, to encompass *former* employees. *See, e.g., Robinson v. Shell Oil Co.,* 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (discharged employee, who had previously filed a com-

---

**13.** The Court notes in hindsight that the question might have been better phrased in terms of whether retiree health benefits are the type of benefits meant to be protected under § 623(a)(1) and (f)(2)(B)(i). Nevertheless, the issue was sufficiently joined by the parties for purposes of our disposing of the pending motions. In their initial and supplemental briefs, the parties located and discussed many (though not all) of the points on which the Court's instant ruling is based.

plaint with the EEOC based on alleged racial discrimination in connection with his termination, could bring retaliation claim under § 704(a) of Title VII against his former employer, based on allegations that former employer had interfered with employee's prospective employment opportunities in retaliation for having filed the EEOC charge). Nor did Congress choose to employ the broader and more generic term "individual" in § 4(f)(2)(B)(i). *Cf.* 29 U.S.C.A. § 623(a)(1).

The statutory language thus seems to present somewhat of an anomaly. "Individuals" are broadly protected against discrimination in terms of their employee benefits. However, employers may, consistent with the equal cost/equal benefit principle, engage in limited forms of age-based discrimination as against "older workers." In order to succeed under the theory they are advancing, Plaintiffs must be both "individuals" and "older workers"—terms which are not defined by the statute.[14] Because the precise application of these provisions is not clear from the statutory language itself, we must look to the broader context and purpose of the Act for guidance.

### 2. *The Legislative History*

Examination of the legislative history suggests that the 1990 amendments to the ADEA were not intended to extend the protection now being sought. For purposes of context, we review the circumstances under which the Older Workers Benefit Protection Act was passed.

With the passage of the ADEA in 1967, Congress "broadly prohibit[ed] arbitrary discrimination in the workplace based on age." *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 120, 105 S.Ct. 613, 83

L.Ed.2d 523 (1985). As originally enacted, § 4(f)(2) provided a narrow exception under which it would not be unlawful for employers "to observe the terms of ... any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of [the Act]." Pub.L. 90–202, § 4, Dec. 15, 1967, 81 Stat. 603, *codified at* 29 U.S.C. § 623(f)(2) (1967). This specific exception was designed to ensure that employees were not discouraged from hiring older workers due to the increased costs involved in providing certain types of benefits to them. *See* S.Rep. No. 101–263, 101st Cong., 2nd Sess, 1990 (April 5, 1990) at pp. 6–8 (discussing legislative history), *reprinted in* 1990 U.S.C.C.A.N. (104 Stat. 978) pp. 1511–1512.

Following the ADEA's enactment, the Department of Labor (which at that time had responsibility for enforcement of the Act) issued a regulation implementing § 4(f)(2). *See* 34 Fed.Reg. 9709 (June 21, 1969), *codified at* 29 C.F.R. § 860.120(a) (1970).[15] The regulation articulated the rule which became known as the "equal benefit or equal cost" principle. It provided that "[a] retirement, pension or insurance plan will be considered in compliance with the statute where the actual amount of payment made, or cost incurred, in behalf of an older worker is equal to that made or incurred in behalf of a younger worker, even though the older worker may thereby receive a lesser amount of pension or retirement benefits, or insurance coverage." *Id.* Though the regulation underwent various permutations, the "equal cost/ equal benefit rule" remained in effect as the basic interpretation of § 4(f)(2).

---

**14.** We would reject any interpretation of the ADEA under which Plaintiffs would claim to be "individuals"—and thus entitled to the broad protection of § 4(a)(1)—but not "older workers" subject to the limited "equal cost/ equal benefit" defense of § 4(f)(2)(B)(i). Under such an interpretation, retirees like Plaintiffs would receive greater protection under the ADEA than active employees. This is a

result which, in our view, could not have been intended under the Act.

**15.** The regulation has since been recodified at 29 C.F.R. § 1625.10, and authority for its enforcement has been transferred to the Equal Employment Opportunity Commission.

## A. *Public Employees Retirement Sys. of Ohio v. Betts*

In 1989, the Supreme Court issued its decision in *Public Employees Retirement Sys. of Ohio v. Betts*, 492 U.S. 158, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989), and held that § 4(f)(2) exempts all provisions of bona fide employee benefit plans from regulation under the ADEA, except where the plan is a subterfuge for discrimination in a non-fringe-benefit aspect of employment. The plaintiff, June Betts, was a speech pathologist employed by the Hamilton County Board of Mental Retardation and Developmental Disabilities. As a public agency employee, Betts received retirement benefits through the Public Employees Retirement System of Ohio (PERS). Under the PERS statutory scheme, two forms of monthly retirement benefits were available to public employees upon termination of their employment: (a) age-and-service retirement benefits and (b) disability retirement benefits. The latter type of benefits were available only to employees who suffered a permanent disability, had at least five years of total service credit, and were under the age of 60 at the time of their retirement. Once an individual retired on either age-and-service benefits or disability retirement benefits, he or she continued to receive that type of benefit throughout retirement, regardless of age. In 1976, the PERS statutory scheme had been amended to provide that disability retirement payments would in no event constitute less than 30 percent of the disabled retiree's final average salary. However, no such floor applied in the case of employees receiving age-and-service retirement benefits.

In 1984 Betts, having become unable to perform her job adequately on account of Alzheimer's Disease, was reassigned to a less demanding position. In May of 1985, at the age of 61, she retired because she was no longer able to perform adequately in any employment capacity. Although Betts received age-and-service retirement benefits, her retirement at age 61 rendered her ineligible for disability retirement benefits under the PERS statutory scheme. This meant that Betts received benefits in the amount of $158.50 per month under the age-and-service retirement plan, as opposed to the $355 per month that she would have received had she been eligible for disability retirement benefits.

Betts filed suit against PERS, claiming that PERS's refusal to grant her application for disability retirement benefits violated the ADEA. The district court agreed and awarded summary judgment in favor of Betts. *See Betts v. Hamilton Cty. Bd. of Mental Retardation*, 631 F.Supp. 1198 (S.D.Ohio 1986). The district court determined that the PERS plan did not come within the § 4(f)(2) exemption because the loss of disability retirement benefits after age 60 was not justified by significant cost considerations. 631 F.Supp. at 1204. The Court of Appeals for the Sixth Circuit affirmed. *See Betts v. Hamilton Cty. Bd. of Mental Retardation and Developmental Disabilities*, 848 F.2d 692 (6th Cir.1988).

The Supreme Court reversed the judgment for Betts. Initially, the Court reaffirmed its prior interpretation of § 4(f)(2)'s "subterfuge" language as requiring a subjective intent on the part of the employer to evade the purposes of the ADEA. 492 U.S. at 171, 109 S.Ct. 2854 (citing *United Air Lines, Inc. v. McMann*, 434 U.S. 192, 203, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977)). It rejected the EEOC's "equal cost/equal benefit" rule as inconsistent with the plain language of the statute, since the regulation did not appear to acknowledge a subjective intent element. 492 U.S. at 171–72, 109 S.Ct. 2854. The Court also did not agree that § 4(f)(2) could be construed so as to make the "equal cost/equal benefit" exception the exclusive means of escaping classification as a "subterfuge." *Id.* Instead, the Court interpreted the exemption of § 4(f)(2) broadly. It concluded that employee benefit plans were intended to be exempt from regulation under the Act "except to the extent plans were used as a

subterfuge for age discrimination in other [non-fringe-benefit] aspects of the employment relation." 492 U.S. at 180, 109 S.Ct. 2854. The Court reversed the judgment in favor of Betts because it concluded that Betts had failed to prove that the reduction in benefits at age 60 was the result of an intent to discriminate in a non-fringe-benefit aspect of employment. *Id.* at 182, 109 S.Ct. 2854.

### B. *The Older Worker's Benefit Protection Act*

In 1990, Congress responded to the *Betts* decision by passing the Older Workers Benefit Protection Act, Pub.L. 101–433, which, among other things, amended § 4(f)(2) of the Act to its present form and specifically overruled both the result and the reasoning of the *Betts* decision. This legislative action was necessary, it was felt, in order "to restore the original congressional intent in passing and amending the [ADEA], which was to prohibit discrimination against older workers in all employee benefits except when age-based reductions in employee benefit plans are justified by significant cost considerations." Pub.L. 101–433, Title I, § 101, set forth in 136 CONG. REC. 25,350 (1990). The OWBPA amended the definitional section of the ADEA to clarify that employee benefits are included within the definition of "compensation, terms, conditions, or privileges of employment." Pub.L. 101–433 § 102, *as codified in* 29 U.S.C. § 630(*l*). In addition, the Act redrafted § 4(f)(2) of the ADEA by eliminating the "subterfuge" language and changing the provision to its present form. *Id.* at § 103(1), *as codified in* 29 U.S.C. § 623(f)(2). The OWBPA also expanded the safe harbors available to employers by creating a new provision under which employers would be permitted to make subsidized early retirement payments and/or Social Security "bridge" payments under a defined contribution plan. *Id.* at § 103(3), *codified in* 29 U.S.C. § 623(*l*)(1)(B). Employers were also allowed to engage in a type of benefit packaging not previously permitted under the ADEA—i.e., offsetting (in the case of a plant shutdown or layoff) an employee's severance benefits by the value of any pension sweeteners or retiree health benefits provided by the employer. *Id.* at § 103(3), *codified at* 29 U.S.C. § 623(*l*)(2)(A).

With respect to § 4(f)(2)(B)(i) of the ADEA, the OWBPA essentially codified the EEOC's articulation of the "equal cost/equal benefit" rule, as set forth in 29 C.F.R. § 1625.10 (1988). Pub.L. 101–433 § 103(1), *codified at* 29 U.S.C. § 623(f)(2)(B)(i). It also clarified, contrary to the ruling of *Betts,* that the "equal cost/equal benefit" exception was an affirmative defense for which the employer would bear the burden of proof. *Id., codified at* 29 U.S.C. § 623(f)(2)(B).

Although retiree health benefits were not the primary focus of the Older Workers Benefit Protection Act, various aspects of the legislative history show that this issue was the subject of some concern. When the Senate version of the bill (S.1511) was originally reported out of the Senate Labor and Human Resources Committee in April of 1990, the Report contained the following passage:

> The Committee intends to approve the parallel practice of integrating retiree health benefits with Medicare, which is already permitted under the regulation. *See* 29 C.F.R. § 1625.10(e). The availability of Medicare benefits from the federal government will not justify a reduction in employer-provided retiree health benefits if the result is that, taking the employer-provided and government-provided benefits together, an older retiree is entitled to a lesser benefit of any type (including coverage for family and/or dependents) than a similarly situated younger retiree. *See id.*

S. Rep. 101–263 (April 5, 1990) at pp. 21–22, printed in 1990 U.S.C.C.A.N. p. 1527. This passage tends to support Plaintiffs' theory that the County was required to comply with the criteria of 29 C.F.R.

§ 1625.10(e), and the "equal cost/equal benefit" rule, in selecting and implementing the subject retirement health care plans. Nevertheless, subsequent legislative history indicates otherwise.

Both S. 1511 and a nearly identical House Bill (H.R.3200) were apparently held off the floor because of opposition. One of the issues which engendered concern was the issue of retiree health benefits. For example, during Senate debates held on September 18, 1990, Senator Grassley acknowledged his support for a bill that would address the problems created by the *Betts* decision. 136 CONG. REC. 24,795 (1990). However, the Senator also wanted assurances that S. 1511 would not "create havoc in the benefits area." *Id.* Accordingly, Senator Grassley entered into the record a number of "major questions" to be addressed by the sponsors of S. 1511, including the following:

4. Some companies do provide health insurance coverage for retirees, but cease such insurance coverage when the retiree becomes eligible for Medicare. Thus, such companies would be spending more for their younger retirees, who are not eligible for Medicare, than for their older retirees, who are receiving Medicare.

If the bill is enacted, would such a company be in violation of the law? Is that the sponsors [sic] intention? If not, what provision in the bill protects employers in such circumstances?

*Id.*

This concern was subsequently addressed during the course of proceedings held on September 24, 1990. On that date, the Senate voted to pass an amended version of S. 1511, which represented a compromise version as agreed to by the various managers, principally Senators Metzenbaum, Pryor, Hatch, and Heinz. One of the express compromise points was the decision to use the term "worker" in § 4(f)(2)(B)(i) of the ADEA, rather than the term "individual." *See* 136 CONG. REC. 25,355 (1990) (Ex. 1, "Summary of Pryor–

Hatch–Metzenbaum–Heinz Agreement on Betts Legislation" at ¶ 8). The "Statement of Managers," which accompanied this final substitute bill, indicates that the managers sought to clarify and eliminate the existing controversy concerning the reduction of retiree medical benefits at Medicare-eligible age:

### RETIREE HEALTH

Many employer-sponsored retiree medical plans provide medical coverage for retirees only until the retiree becomes eligible for Medicare. In many of these cases, where coverage is provided to retirees only until they attain Medicare eligibility, the value of the employer-provided retiree medical benefits exceeds the value of the retiree's Medicare benefits. Other employers provide medical coverage to retirees at a relatively high level until the retirees become eligible for Medicare and at a lower level thereafter. *In many of these cases, the value of the medical benefits that the retiree receives before becoming eligible for Medicare exceeds the total value of the retiree's Medicare benefits and the medical benefits that the employer provides after the retiree attains Medicare eligibility. These practices are not prohibited by this substitute.* Similarly, nothing in this substitute should be construed as authorizing a claim on behalf of a retiree on the basis that the actuarial value of employer-provided health benefits available to that retiree not yet eligible for Medicare is less than the actuarial value of the same benefits available to a younger retiree.

136 CONG. REC. 25,353 (1990) (emphasis supplied). Senator Hatch explained that this restriction was actually intended to protect retired persons by avoiding the creation of a regulation which might discourage employers from offering health benefits to their retirees:

Many employers continue health benefits for persons who retire before they

are eligible for Medicare and/or continue certain benefits that are supplemental to Medicare.

This is a positive practice which helps provide important protections for retirees.

*This compromise ensures that the bill will not interfere with these important benefits that are vital to retirees of all ages.*

*Id.* at 25,356 (emphasis supplied). Senator Hatch further explained that the compromise bill was intended to strike a balance between "protect[ing] older workers' rights to fair and equitable benefits" under the ADEA "without disrupting the variety of employer-sponsored policies that benefit all workers." *Id.* at 25,357. The Senator expounded on this point:

It has been our policy to encourage employers to provide generous employee benefits. Clearly, this objective is frustrated, if not defeated, if Congress enacts legislation that so heavily encumbers American companies that they must reduce or eliminate such benefits.

\* \* \* \* \* \*

We must be concerned about the impact on all employees of additional Federal requirements that unnecessarily complicate existing arrangements or that will shift a firm's resources from actual benefits into regulatory compliance or litigation.

If an employer is forced to reduce or eliminate benefits for some workers to avoid litigation exposure or to avoid going afoul of the law, we have to ask the question: Is it worth it?

*Id.*

On October 2, 1990, the final substitute version of S. 1511 was presented in the House of Representatives. *See* 136 CONG. REC. 27,055 (1990). The Managers on the House side specifically adopted and incorporated into the record the Statement of the Senate Managers, including the Senate Managers' discussion of "Retiree Health," quoted *infra. See id.* at 27,061–27,062.

Thus, like the Senate Managers, the House Floor Managers were apparently of the view that employers would not run afoul of the ADEA by providing disparate health benefits as between their Medicare-eligible and non-Medicare-eligible retirees. If, as the Statement of Managers suggests, the ADEA does not prevent an employer from offering health benefits to retirees only up until the time of Medicare-eligibility, then presumably an employer (like the County) cannot commit a violation of the Act by offering to do more.

We note that Plaintiffs have purported to cite contrary legislative history in support of their theory of liability. Specifically, during the floor debates of September 24, 1990, Senator Bentsen inquired of Senator Pryor whether the Texas Teacher Retirement System would be consistent with the OWBPA. That system provided a different retiree health plan for retirees age 65 and over because those retirees were eligible for Medicare Part B. Senator Bentsen posed the following question to Senator Pryor:

If the system pays approximately the equivalent amount to purchase the private insurance for the prospective retiree under 65 as for the prospective retiree 65 or older, does the system's retiree health package violate the ADEA as amended by [the OWBPA]?

136 CONG. REC. 25,366 (1990). Senator Pryor gave a somewhat tentative response:

I would say to my good friend from Texas that I wish I could give him a more definite answer than the one I am about to give. I know that he wants to provide a comfort level with this legislation for the Texas State Teacher's Retirement System.

The purpose of equal benefit or equal cost is to allow employers to take account of the fact that the cost of some benefits rises with the age of the employee. If your scenario is correct and the system spends the same amount in acquiring health coverage for all pro-

spective retirees regardless of age, I would say that the system has a good argument that it has satisfied the equal benefit or equal cost principle.

*Id.*

We are not convinced that this exchange supports the Plaintiffs' theory of recovery in this case. First, in light of the clear directive on "Retiree Health" set forth in the Statement of Managers, we question the persuasiveness of Senator Pryor's comments. Furthermore, when the above conversation is read in context, it appears that the most one can say about Senator Pryor's comments is that he apparently believed the ADEA afforded protection from discriminatory retirement health plans that were in effect *prior* to the time of the worker's retirement. We note that the colloquy cited by Plaintiffs was preceded by the following exchange:

> Mr. BENTSEN. Is it the understanding of the Senator that the Age Discrimination in Employment Act does not apply to retirees?
>
> Mr. PRYOR: The distinguished Senator is correct. The ADEA applies only to employees and those individuals seeking employment. However, it does apply to an individual whose retirement benefits are discriminatorily structured *prior to retirement.*

136 CONG. REC. 25,366 (1990) (emphasis added). Senator Bentsen then went on to pose his question to Senator Pryor concerning the Teacher Retirement System of Texas. Notably, however, the two Senators spoke *in terms of health benefits that were being offered under the Texas Plan* to *prospective* retirees.

In sum, then it seems that Senator Pryor interpreted the ADEA as generally inapplicable to retired persons; however, in his view, *prospective retirees* would be able to claim protection where an employer offered discriminatorily structured retirement health plans that were in effect at the time the prospective retirees were still employed. Similar views were expressed

by Representative Clay during debates in the House of Representatives:

> Since the ADEA covers only employees and those individuals seeking employment, nothing in the bill would apply the provisions of the ADEA to retirees. Thus, for example, it would not be a violation of the ADEA, if an employer provided an ad hoc cost-of-living adjustment to all current retirees above a certain age. Of course, nothing in the bill would alter the current protection under the ADEA for an employee whose retirement or health benefits are discriminatorily structured based on age at the time of retirement.

136 CONG. REC. 27,059 (1990). Even assuming this interpretation, however, it does not advance the Plaintiffs' claim. In this case, Plaintiffs are complaining about allegedly discriminatory changes in their health plans which occurred *after* their retirement. Thus, even assuming there is an ambiguity in the record concerning the application of § 4(f)(2)(B)(i) to retirement health benefits, it is not an ambiguity which assists the Plaintiffs' cause.

### 3. *The Administrative Regulations*

The administrative history also suggests that, historically, the EEOC did not consider retirees to be protected by the "equal cost/equal benefit" rule in the context of health benefits. This point is borne out by an examination of the history of the applicable administrative regulation.

As noted above, when the ADEA was originally passed in 1967, the initial implementing regulation interpreted § 4(f)(2)'s "subterfuge" language as requiring compliance with the "equal cost/equal benefit" rule for age-based cost distinctions in certain employee benefits. *See* 34 Fed.Reg. 9709 (June 21, 1969), *codified in* 29 C.F.R. § 860.120(a) (1970). In 1978, Congress increased the "cut-off" age for protection under the ADEA from age 65 to age 70. *See* Age Discrimination in Employment Act Amendments of 1978, Pub.L. 95–256, § 3(a) (April 6, 1978), 92 Stat. 189. This

meant that, for the first time, individuals over the age of 65 were now covered by the ADEA.

In response to this change, the Department of Labor issued an interpretive bulletin which specifically addressed the application of the "equal cost/equal benefit" rule in the context of health care benefits for older workers who were Medicare-eligible. *See* 44 Fed.Reg. 30648 (May 25, 1979). The Department's May 25, 1979 Interpretive Bulletin expressly authorized the use of Medicare "carve-out" plans[16] and supplemental plans[17] that would encourage employees over the age of 65 to choose Medicare as their primary insurer. *See* 29 C.F.R. § 860.120(f)(1)(ii)(A) (1980), published at 44 Fed.Reg. 30660 (May 25, 1979).

In 1982, Congress passed the Tax Equity and Fiscal Responsibility Act ("TEFRA") of 1982. Pub.L. 97–248, 96 Stat. 324 (1982). Section 116(a) of the TEFRA added a new subsection (g) to § 4 of the ADEA, which stated: "Any employer must provide that any employee aged 65 through 69 shall be entitled to coverage under any group health plan offered to such employee under the same conditions as any employee under age 65." *Id.* at Title I, § 116(a), 96 Stat. 353 (1982), *as codified in* 29 U.S.C. § 623(g) (1982). In essence, this amendment nullified the "equal cost/equal benefit" rule with respect to group health plans and instead created the more stringent requirement that employers offer health coverage under any group health plan on the same terms and conditions to *all of their employees, regardless of age.* The intent of this provision was to reduce federal expenditures by shifting from Medicare to employers some portion of the costs associated with providing health care to employees ages 65 and older. *See* 48 Fed.Reg. 26435 (June 7, 1983) ("[t]he overall intent of Section 4(g) [is] to relieve Medicare of the responsibility of providing primary health insurance coverage for the working elderly.").

The EEOC published interim regulations the following year which were designed to provide guidance for complying with the new § 4(g) of the ADEA.[18] *See* 48 Fed.Reg. 26434 (June 7, 1983). Significantly, the EEOC advised that *retirees would not be considered "employees" covered by 29 U.S.C. § 623(g).* The EEOC's interim rule of June 7, 1983 noted that the "TEFRA amendment to the ADEA significantly alters an employer's obligations regarding maintenance of group health insurance plans for *active* employees aged 65 through 69." *Id.* at 26434 (emphasis supplied). The EEOC further commented:

> The issue has also been presented concerning an employer's obligations to employees aged 65 through 69 who are at present not actively employed but who are receiving health care benefits by virtue of extended coverage under an employer's health plan. In such a situation, the Commission will look to all the facts and circumstances to determine whether an employment situation still exists. Employees engaged in seasonal work who retain seniority rights and other indicia of a continuing employment

---

**16.** "Carve-out" health plans refer to plans whereby, for employees ages 65 or older, the employer "carves out" from its own health insurance plan, or directly offsets, those benefits actually paid for by Medicare. Under this approach, Medicare assumes primary responsibility for health care expenses and the employer's regular plan pays only for those expenses it insures against which are not actually paid for by Medicare. *See* 44 Fed.Reg. 30653–30654, 30660 (May 25, 1979).

**17.** Medicare-supplement plans are separate health insurance plans for employees ages 65

or older which attempt to anticipate the benefits that will be paid under Medicare and then supplement the employee with benefits which Medicare is not anticipated to pay. *See* 44 Fed.Reg. 30654, 30660 (May 25, 1979).

**18.** Responsibility and authority for the enforcement of the ADEA was officially transferred from the Department of Labor to the Equal Employment Opportunity Commission effective July 1, 1979. *See* 48 Fed.Reg. 26434 (June 7, 1983).

relationship will in all likelihood fall within the meaning and spirit of Section 4(g). On the other hand, employees gratuitously provided extended coverage after the termination of employment status were not intended to fall within the scope of section 4(g). Their status would be most like that of a retiree.

*Retirees are not embraced by the term employee and are, therefore, not covered by the literal wording of the new section.*

*Id.* at 26435 (emphasis supplied).

Section 4(g) of the ADEA was later repealed in 1989 but, in the meantime before that repeal occurred, the EEOC deleted subsection (f)(1)(ii) of 29 C.F.R. § 1625.10 [19]—the regulation which had previously authorized the use of employer-provided Medicare "carve-out" and "Medicare supplement" health benefit plans. The reason for this deletion was that the EEOC considered the authorization for Medicare carve-out plans and Medicare-supplemental plans to be contrary to, and in conflict with, the directive of § 4(g) of the ADEA. *See* 53 Fed.Reg. 5971–5972 (Feb. 29, 1988).

Although convoluted, this somewhat tortured legislative and administrative history demonstrates several significant points. First, § 4(f)(2) of the ADEA has always been interpreted by the EEOC as requiring compliance with the equal cost/equal benefit rule where age-based distinctions in employee benefits are concerned. Second, insofar as the specific benefit of health insurance is concerned, from 1982 to 1989, the protections afforded by § 4(f)(2) were superseded and supplanted by a more specific and exacting form of protection under § 4(g). Third, it is apparent that the EEOC considered retirees to be outside the scope of protection afforded by Section 4(g). Thus, we can logically infer that the EEOC likewise viewed retirees as outside the scope of protection

afforded by § 4(f)(2), at least where the subject of health benefits is concerned.

### 4. *Policy Considerations*

Finally, the Court finds that there are valid policy reasons which support the conclusion that Plaintiffs are not entitled under the ADEA to the relief they now seek. For one, the legislative history suggests that Congress's primary purpose in passing the OWBPA was to prohibit the type of employee benefit discrimination, such as that at issue in the *Betts* case, which might discourage older workers from remaining in the workforce and/or punish older workers who remain actively employed. In his description of the major features of S. 1511, Representative Clay explained the significance of preventing discrimination in employee benefits:

> It is little consolation to an older worker to be protected from discriminatory wage payments if an employer is free to discriminate based on age in the broad range of employee benefits that are included as part of an individual's compensation, benefits that often are valued between one-quarter and one-third of earned wages.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Congressional reaffirmation of the original 'equal benefit and equal cost' principle, subject to the narrow exceptions the Congress has crafted, will ensure that productive older workers, an ever-growing segment of our labor force both in numbers and importance, are not discouraged from remaining actively employed. The elimination of mandatory retirement, the requirement of non-discriminatory pension accruals for employees working beyond normal retirement age, and recent changes in the social security system are designed to eliminate barriers, monetary and otherwise, to the continued employment of older persons.

---

**19.** The regulations set forth in the Labor Department's May 25, 1979 Interpretive Bulletin were recodified at 29 C.F.R.

§ 1625.10(f)(1)(ii)(A)-(C) (1987). *See* 52 Fed. Reg. 23812 (June 25, 1987).

136 CONG. REC. 27,059 (1990). The case of *Public Employees Retirement Sys. of Ohio v. Betts* is illustrative. In *Betts,* the "evil" presented by the Ohio PERS disability plan was that active workers like June Betts were penalized for remaining actively employed past age 60. That is, it was *because* Betts remained actively employed until age 61, rather than taking an earlier disability retirement, that she lost her eligibility for a disability retirement. Thus, the discriminatory system, which was in effect while Betts was still actively employed, essentially discouraged her and other older workers from remaining in the work force because they would be penalized by virtue of the fact that they became disabled at an older age.[20]

By contrast, the policy about which Plaintiffs now complain did not penalize any of the Plaintiffs for remaining actively employed, nor did it effectively discourage them from remaining in the work force. To the contrary, under the policy at issue here, Plaintiffs would be better off by having remained in the work force, because it is undisputed that active employees remain eligible for health coverage under the traditional indemnity plan that Plaintiffs so strongly favor. Thus, the alleged discrimination at issue here does not undermine the ADEA's goal of encouraging the employment of older individuals.

Second, the statement of the Senate Managers and the comments of Senator Hatch suggest that these legislators considered retiree health benefits an important largess which should not be discouraged or jeopardized by a rigid application of the equal cost/equal benefit rule. Because the cost of such benefits can represent a prohibitively large expense, there is a very real danger that employers would attempt to comply with the equal cost/ equal benefit rule by simply eliminating (or severely reducing) health benefits for all retirees. The statement of the Senate Managers regarding "Retiree Health" and the comments by Senator Hatch reflect a Congressional intent to encourage employers to provide retirement health benefits (even if limited in duration) by freeing them of the regulations imposed by § 4(f)(2)(B)(i). In short, it appears that Congress believed "something is better than nothing" in the area of retiree health benefits.

Finally, applying the Plaintiffs' interpretation of the ADEA to this case would result in a potentially problematic construction under § 4($l$)(2) of the Act. *Inter alia,* that provision allows employers, in the case of "a contingent event unrelated to age" (i.e., layoffs or plant shutdowns), to offset an employee's severance pay by the amounts of any retiree health benefits and/or "pension sweeteners" to which the employee might be entitled. *See* 29 U.S.C.A. § 623($l$)(2)(A) (West 1999). *See also* 136 CONG. REC. 27,059–27,060 (1990) (discussing the operation of § 4($l$)(2) in more detail). Notably, § 4($l$)(2)(D) and (E) specifically contemplate that an employer will be able to avail itself of this setoff even if the employer does not provide retiree health benefits to retirees over the age of 65. 29 U.S.C.A. § 623($l$)(2)(D) and (E). Stated differently, it appears that an employer is not required under the ADEA to offer retiree health benefits to both pre-Medicare and post-Medicare eligible retirees in order to take advantage of the offset.

Given this fact, Plaintiffs' interpretation of the ADEA seems problematic. Under

**20.** The fact that Congress deliberately limited § 4(f)(2)(B)(i)'s application to benefits afforded to "older workers" and "younger workers" is further evidence that Congress's primary intent was to prohibit discriminatory benefit plans which, if not cost-justified under the equal cost/equal benefit rule, might impact arbitrarily and adversely on *active* employees. Likewise, the comments of Senator Pryor and Representative Clay (suggesting that the ADEA does not protect retirees but does protect employees who are subjected to a discriminatory benefit plan in effect at the time of retirement) also support the view that Congress intended the OWBPA to prevent discriminatory benefit plans which have a detrimental impact on active employees.

Plaintiffs' theory, it is a violation of the ADEA to provide disparate health benefits to retirees based on Medicare eligibility or non-eligibility. Yet § 4(*l*)(2) would permit the employer to take advantage of the severance/retiree health benefit setoff, even if the employer is maintaining a retirement health plan which, under the Plaintiffs' theory, is violative of the Act. It is illogical to believe that Congress would have intended employers to be able to benefit in this manner from the offering of a retiree health benefit plan which is unlawful under the Act.

For all of the foregoing policy reasons, we conclude that the ADEA does not afford the protection which Plaintiffs are seeking.

### 5. *Plaintiffs' Cases*

In arguing that they are entitled to protection under the ADEA, Plaintiffs rely chiefly on *Milwaukee Prof. Fire Fighters v. City of Milwaukee,* 869 F.Supp. 633 (E.D.Wis.1994) and *McKeever v. Ironworker's District Council,* No. Civ. A. 96–5858, 1997 WL 109569 (E.D.Pa. March 7, 1997). Having carefully reviewed this authority, we find the first case distinguishable and the second one unpersuasive.

In *Milwaukee Prof. Fire Fighters,* unions representing firefighters and other city employees brought suit against various city agencies, alleging that certain aspects of the retirement/disability plan violated the ADEA. Unlike the benefit plans at issue in this case, the plans at issue in *Milwaukee* did not involve specifically the administration of retiree health benefits, and thus the district court did not have any occasion to consider the special policy considerations or the legislative history at issue here. Secondly, the benefit plans at issue in *Milwaukee* involved benefit schemes whose discriminatory provisions (i) were in place while the individuals were still active employees, and (ii) provided disincentives for the individuals to remain in the active work force, because they penalized the retirees for having worked to

an older age. These plans were thus very much like the type of plans at issue . in *Betts,* so it is clear that the *Milwaukee* plaintiffs were advancing the types of claims intended to be within the scope of the OWBPA's protection.

More to the point is *McKeever v. Ironworker's Dist. Council,* No. Civ. A. 96–5858, 1997 WL 109569 (March 7, 1997), which Plaintiffs also rely on and which, at least facially, does appear to support their case. The plaintiffs in *McKeever* were retired union members who were enrolled in a lifetime health benefit plan as a benefit of their employment. The plan was subsequently amended to exclude coverage for retirees and pensioners who had reached age 65. The plan administrators sought dismissal partly on the ground that the plaintiff retirees were not "employees" within the meaning of the ADEA, and therefore lacked standing to bring suit under the Act.

The district court concluded both that the plaintiffs had standing to bring their claim and that they had stated a viable claim for relief under the ADEA. The *McKeever* court initially considered the language of § 623(a) and found the terms "employee" and "individual" to be ambiguous as to whether they include or exclude retirees. The court noted that the language of § 623(a)(1) creates a "legally protected interest in not being discriminated against in eligibility for employment-related benefits based on age," but it "does not define the duration of that coverage." 1997 WL 109569 at *2. Nevertheless, the *McKeever* court resolved the ambiguity in favor of the retirees. It noted that the ADEA is a remedial statute and that certain provisions of the ADEA—such as the proscription against discriminatory discharges, and the ability of courts to issue reinstatement under the ADEA—clearly contemplate that former employees will make use of the statute's remedial provisions. The court reasoned that "a finding that retirees are included within § 623(a)(1)'s coverage is more consistent

**880**

with the broader context provided by other ADEA sections and with the ADEA's general remedial purposes." *Id.* at *3. The court was concerned that "[f]ailure to recognize these retired individuals' claim would potentially undermine the protective purposes of the statute." *Id.* at *3.

This Court is in agreement with the *McKeever* court's opinion that the terms "employee" and "individual" are facially ambiguous with respect to the scope of coverage afforded to retired persons. Further, we agree with the general proposition that certain aspects of the ADEA were clearly intended to afford protection to former employees including, in some circumstances, retirees. The case of June Betts is a case in point.[21]

Nevertheless, we respectfully depart from the conclusion of the *McKeever* court insofar as it holds that the term "employee" or "individual" extends to retirees seeking to challenge an alleged disparity in post-retirement health benefits based on Medicare eligibility. First, the *McKeever* decision makes no mention whatsoever of the legislative and administrative history which, at least in this Court's view, clearly demonstrates Congress's intent to prohibit these types of challenges under the ADEA. Second, the *McKeever* court did not acknowledge or attempt to reconcile the provisions of § 623(*l*)(2)(D), which appears to sanction (at least implicitly) retiree health plans that provide benefits only up to the age of Medicare-eligibility. For these reasons, this Court respectfully declines to adhere to the reasoning and holding of *McKeever*.

*Summary*

Although the Court is mindful of the ADEA's remedial nature and appreciative of the need to construe the Act liberally where ambiguity exists, we must also attempt to apply the Act in the manner in which Congress intended. The terms "in-

dividual" (as used in § 4(a)(1)), "employee" (as used in § 4(a)(2)), and "older worker" (as used in § 4(f)(2)(B)(i)) do not facially indicate whether the Plaintiff retirees are entitled to the type of protection they are seeking under the ADEA. Nevertheless, when we consider these terms in the specific context advanced by the Plaintiffs, and in light of the broader context of the statute as a whole (as set forth in the extensive legislative and administrative history), we conclude that there is no ambiguity in the intended application of the ADEA. For all of the reasons discussed above, we conclude that the ADEA clearly was not intended to apply to retirees, like the Plaintiffs here, who premise their complaint on alleged disparities in their retirement health benefits based on Medicare-eligibility.

In rejecting the Plaintiffs' claim for relief under the Act, note that Plaintiffs are not left completely without a remedy at this point. They are alleging that the County breached a promise to continue providing health care, throughout their retirement, on the same terms and conditions under which it was provided while the Class members were active employees. Accordingly, Plaintiffs may still pursue their state law claims for breach of contract and promissory estoppel.

## IV. CONCLUSION

Based upon the foregoing reasons, we conclude that the ADEA does not afford relief to the Plaintiffs under the theory they are advancing. We will therefore deny Plaintiffs' motion for partial summary judgment on Count I and grant the Defendant's cross-motion for partial summary judgment on that same count.

An appropriate order follows.

---

**21.** *See also* 29 U.S.C. § 623(f)(2)(B)'s proscription against employee benefit plans which require or permit the involuntary retirement of an individual based on his or her age. Obviously, an individual who is forced to "retire," in violation of this provision, might well seek redress under the ADEA.

## ORDER

AND NOW, this ___ day of September, 1999, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiffs' Motion [Doc. No. 16] for Partial Summary Judgment is DENIED and the Defendant's Motion [Doc. No. 26] for Partial Summary Judgment is GRANTED.

JUDGMENT is hereby entered in favor of Defendant, the County of Erie, Pennsylvania on Count I in accordance with the terms of the accompanying Memorandum Opinion.